**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1479
_____

MARIA ARGUETA; WALTER CHAVEZ; ANA
GALINDO; W.C., by and through his parents Walter Chavez
and Ana Galindo; ARTURO FLORES; BYBYANA ARIAS;
JUAN ONTANEDA; VERONICA COVIAS; YESICA
GUZMAN

v.

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT ("ICE");
JULIE L. MYERS, Assistant Secretary for Immigration and
Customs Enforcement; JOHN P. TORRES, Deputy Assistant
Director for Operations, Immigration and Customs
Enforcement; SCOTT WEBER, Director, Office of Detention
and Removal Operations, Newark Field Office;
BARTOLOME RODRIGUEZ, Former Director, Office of
Detention
and Removal Operations, Newark Field Office; JOHN DOE
ICE AGENTS 1-60; JOHN SOE ICE SUPERVISORS 1-30;
JOHN LOE PENNS GROVE OFFICERS 1-10

Julie L. Meyers, Bartolome Rodriguez
John P. Torres, Scott Weber,
<u>Appellants</u>

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-08-cv-01652-001)
District Judge:   Hon. Peter G. Sheridan
_____

Argued April 14, 2011

BEFORE:  FISHER, JORDAN, and COWEN, Circuit Judges

(Filed:  June 14, 2011)

Gjon Juncaj, Esq.
Melanie Keiper, Esq.
Nicole Prairie, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20001

Edward J. Martin, Esq.
Sarah Elisabeth Whitman, Esq.
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, DC 20044

Howard S. Scher, Esq. (Argued)
United States Department of Justice
Civil Division
Room 7239
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

    Counsel for Appellants

Baher A. Azmy, Esq. (Argued)
Seton Hall Law School
833 McCarter Highway
Newark, NJ 07102

Heather Colleen Bishop, Esq.
Natalie J. Kraner, Esq.
Aurora Franceca Parrilla, Esq.
David Marshall Reiner, Esq.
R. Scott Thompson, Esq.
Scott L. Walker, Esq.
Catherine Weiss, Esq.
Kenneth H. Zimmerman, Esq.
Lowenstein Sandler
6t Livingston Avenue
Roseland, NJ 07068

    Counsel for Appellees

Claire Prestel, Esq.
Public Justice
1825 K Street, N.W.
Suite 200
Washington, DC 20006

Counsel for Public Justice;
Prisoners' Rights Project of the Legal
    Aid Society of the City of New York;
Pennsylvania Institutional Law Project,
Amicus Appellees

Lawrence S. Lustberg, Esq.
Gibbons
One Gateway Center
Newark, NJ 07102-5310

Counsel for LatinoJustice PRLDEF;
American Civil Liberties Union of New Jersey;
Asian American Legal Defense and
    Education Fund;
Catholic Charities of the Archdiocese of Newark,
Amicus Appellees

_____

OPINION
_____

COWEN, <u>Circuit</u> <u>Judge</u>.

Defendants Julie L. Myers, John P. Torres, Scott Weber, and Bartolome Rodriguez ("Appellants") appeal from the orders of the United States District Court for the District of New Jersey denying their motions to dismiss on qualified immunity and personal jurisdiction grounds. This <u>Bivens</u> action arises out of (in the words of the Plaintiffs' Second Amended Complaint) an alleged "practice of unlawful and

4

abusive raids of immigrant homes across the state of New Jersey" conducted by Immigration and Customs Enforcement ("ICE") agents under a nation-wide program instituted by the Department of Homeland Security ("DHS") known as "Operation Return to Sender." (JA530.) The nine named Plaintiffs in this action were the alleged victims of a number of raids executed in New Jersey. On the other hand, Appellants are or were high-ranking federal officials, and they contend, inter alia, that the individual capacity claims for damages against them must be dismissed pursuant to the qualified immunity doctrine and the Supreme Court's ruling in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

We conclude that Plaintiffs failed to allege a plausible Bivens claim against these four officials. We will reverse the District Court's denial of qualified immunity (and therefore need not—and do not—consider whether we have pendent appellate jurisdiction over Appellants' appeal from the District Court's personal jurisdiction ruling or whether the District Court committed reversible error by denying the motion to dismiss on personal jurisdiction grounds).

I.

A.    The Allegations

We begin with the allegations in Plaintiffs' lengthy Second Amended Complaint. The Plaintiffs named in the Second Amended Complaint resided in New Jersey, are of Latino origin, and were allegedly subjected to unlawful and abusive raids conducted under Operation Return to Sender

5

sometime between August 2006 and April 2008.[1] In addition to a number of as yet unknown ICE agents and local police officers from Penns Grove, New Jersey (who allegedly participated in the August 1, 2006 raid of Guzman's house and were the targets of several claims under 42 U.S.C. § 1983 and the New Jersey Constitution), they named as Defendants: (1) ICE; (2) Myers, who "is, and was at all relevant times, the Assistant Secretary for Homeland Security for Immigration and Customs Enforcement, located in Washington D.C." (JA534); (3) Torres, who "is Deputy Assistant Secretary for Operations for ICE, and was at all relevant times, the Director (or Acting Director) of the ICE Office of Detention and Removal Operations ('DRO') in Washington D.C." (id.); (4) Weber, the Director of the DRO Field Office in Newark, New Jersey; and (5) Rodriguez, the former Acting Field Director

---

[1] The nine Plaintiffs named in the Second Amended Complaint were (in alphabetical order): (1) Maria Argueta, who held lawful temporary protection status; (2) Bybyana Arias, an American citizen; (3) Walter Chavez, a lawful permanent resident; (4) Veronica Covias, a lawful permanent resident; (5) Arturo Flores, an American citizen; (6) Ana Galindo, a lawful permanent resident; (7) Yesica Guzman, a lawful permanent resident; (8) Juan Ontaneda; and (9) W.C., the minor child of Chavez and Galindo and an American citizen.

The raids allegedly took place on or about the following dates (in chronological order): (1) August 2006 (Guzman); (2) November 13, 2006 (Flores and Arias); (3) March 26, 2007 (Covias); (4) December 7, 2007 (Ontaneda); (5) January 29, 2008 (Argueta); and (6) April 2, 2008 (Chavez, Galindo, and W.C.).

of the Newark DRO Field Office.  Appellants (as well as the unknown ICE agents) were specifically named in both their individual and official capacities.

Myers was responsible for implementing the Immigration and Nationality Act and administering ICE. "ICE press releases describing arrests in New Jersey under Operation Return to Sender have repeatedly stated that those arrests were made pursuant to the nationwide immigration enforcement strategy announced by defendant Myers and Michael Chertoff, Secretary of the Department of Homeland Security." (JA534.)  In turn, DRO is the ICE branch responsible for coordinating "the removal of foreign nationals not entitled to remain in the country." (Id.)  As DRO Director, Torres oversaw the apprehension, detention, and removal of foreign nationals charged with violating federal immigration law, and he supervised law enforcement officers assigned to DRO field offices and, in particular, "Fugitive Operations Teams" ("FOTs"). (JA535.)  Weber and Rodriguez were responsible for managing ICE enforcement activities in New Jersey, including the implementation of Operation Return to Sender.

Plaintiffs devoted much of their pleading to an extensive discussion of this implementation.  Since 2002, DRO has overseen the National Fugitive Operation Program. This program was established to arrest and remove "so-called immigration 'fugitives,'" defined by ICE as either individuals with outstanding deportation orders or persons who failed to report to a DRO officer after receiving notice to do so. (JA537.)  As part of increased enforcement efforts (which allegedly included doubling the number of New Jersey FOTs from two to four), each and every FOT in the nation was

7

allegedly ordered to arrest 1,000 fugitive aliens per year. According to the Second Amended Complaint, "[t]his quota represented an 800% increase on the previous quota of 125 arrests per year, mandated just two years earlier." (JA538.) ICE officially commenced Operation Return to Sender on May 26, 2006, with the program purportedly directed at apprehending fugitive aliens and especially aliens with criminal records.

The number of individuals arrested by FOTs increased as a result of these changes. For instance, New Jersey FOT arrest numbers went from 1,094 in FY 2006 to 2,079 in FY 2007. Plaintiffs specifically alleged that, despite the supposed purposes of the operation itself, "[t]he majority of individuals arrested in New Jersey under Operation Return to Sender . . . are neither criminals nor fugitives." (JA542.) Accordingly, 87% of the individuals arrested in New Jersey in FY 2007 evidently had no criminal history, and ICE statistics indicated that as few as one in three individuals arrested in New Jersey was actually a fugitive alien. "The remaining individuals arrested were a mix of undocumented immigrants and, upon information and belief, United States citizens, permanent residents and visa-holders who have never had any court order, warrant, or criminal conviction against them." (Id.) ICE referred to these persons as "collateral arrests," even though this "euphemism" allegedly "obfuscated" the reality that its enforcement activities often served as pretexts for sweeping up large numbers of immigrants. [2] (Id.) According to a 2007 report from the DHS

---

[2] We note that a September 29, 2006 memorandum from Torres, obtained by Plaintiffs after the filing of the initial complaint, stated that "collateral" arrests could be counted

8

Inspector General, the database used to locate fugitive aliens "is outdated and inaccurate in up to 50% of cases." (JA531.) The report further stated that DRO began hiring "lower-level, less experienced officers for fugitive operations" in 2006 and that "some fugitive operations agents have not completed the Fugitive Operations Training Program—2004 guidelines allow the agents to work for up to two years before receiving necessary training." (JA544 (citing JA242-JA311).) ICE's enforcement activities were also the subject of a February 13, 2008 hearing before the House Judiciary Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law. At this hearing, an ICE representative allegedly acknowledged that American citizens were detained and even deported, and the chair remarked that we "had reached an era 'where an overzealous government is interrogating, detaining and deporting its own citizens while treating non-citizens even worse.'" (JA543.)

Plaintiffs explained that the "practice" of unlawful and abusive raids flourished as a predictable consequence of the "arbitrary" and "exponentially-increased" quotas. (JA530.) "Under pressure from these quotas immigration agents have regularly disregarded the obligation to secure a judicial warrant or probable cause in carrying out unlawful entries and dragnet searches of homes in which the agents only loosely suspect immigrant families may reside." (Id.) Plaintiffs alleged that their own personal experiences (also described in some detail in their pleading) "are typical of the 'Operation Return to Sender' home raid *modus operandi* throughout the state and the nation, which has been comprehensively

towards the alleged quota in certain circumstances.

9

documented through media reports and first-hand accounts from other victims." (JA531.)

Specifically, the raids allegedly violated the Fourth and Fifth Amendments to the United States Constitution. Due to the flaws in the database and other deficiencies, the unconstitutional conduct allegedly began even before the team of ICE agents arrived at a particular residence. In other words, "[a]gents regularly raid homes where the purported 'fugitive' target is not present and could not be present." (JA531.) It is uncontested that the agents must obtain consent in order to enter a person's home. According to Plaintiffs, the agents typically failed to obtain the requisite consent.[3] The

---

[3] Among other things, Plaintiffs alleged that: (1) a home raid typically occurred in the pre-dawn hours of the morning, with multiple ICE agents surrounding a home believed to house one or more immigrant families and pounding furiously on the door and windows; (2) the agents used a variety of frequently deceptive and even coercive tactics to get an occupant to open the door, including (a) falsely identifying themselves as police officers (when they were actually administrative officers authorized to enforce federal immigration laws but usually lacking general police powers), (b) enlisting the aid of local police officers to deceive the occupant as to their identities (with such misrepresentations taking on special importance in New Jersey because state officials encouraged immigrant populations to assist local police without fear of immigration consequences), or (c) simply storming into the home once the occupant opened the door believing there was an emergency (and sometimes even physically breaking down the door); (3) some agents treated the raids as a "perverse sport," as illustrated by an April 30,

pattern of unconstitutional conduct then allegedly continued once the ICE agents actually entered the home.[4] Plaintiffs claimed that this whole process was then repeated at other homes until the agents' van was filled. According to

2007 e-mail from a Connecticut ICE agent to a state police trooper inviting the state troopers to an upcoming raid in New Haven, promising a "'fun time,'" and asking if any of "'you guys can play'" (JA539 (quoting JA236)); and (4) for many agents, deceit and dishonesty became a regular part of the raids, as demonstrated by a reported incident from Freehold, New Jersey, in which the ICE team leader, after the occupants refused to open the door, asked to have a marked police vehicle pull up to the house and a uniformed police officer knock on the door, with ICE then "tak[ing] over the investigation'" (JA540 (quoting JA240)).

[4] Plaintiffs specifically claimed, among other things, that: (1) multiple ICE agents typically entered and quickly swept through the home, displaying or brandishing firearms and even occasionally pointing their weapons at the occupants who often were partially undressed or sitting terrified in their night clothes; (2) they then usually ordered all of the occupants to a central location in the home and then interrogated them about their identities and immigration statuses despite the lack of any reasonable basis for believing they were not citizens and the fact that the purported target of the raid was frequently unknown to the occupants themselves; (3) the agents, in front of children and other family members, handcuffed individuals they suspected were unlawfully present in this country and marched them into a waiting van; and (4) in some raids, the ICE agents were verbally and even physically abusive.

11

Plaintiffs, the agents' actions had an especially devastating impact on children (most of them citizens), who had to watch "law enforcement agents sweeping through their homes with guns, ordering them and their parents to gather together and suddenly handcuffing and dragging away their parents in the middle of the night." (JA541.)

With respect to Appellants, Plaintiffs asserted that, "[d]espite aggressively increasing the arrest quotas and the number of agents participating in 'Operation Return to Sender,' and thereafter being notified—via press reports, lawsuits, and congressional testimony—of the widespread allegations of unconstitutional and abusive conduct by ICE agents as part of this program, the DHS supervisory officials named in this Complaint have continued to foster an institutional culture of lawlessness." (JA531-JA532.) In short, these supervisory officials allegedly failed to develop meaningful guidelines or oversight mechanisms to ensure that home searches were conducted in a constitutional fashion, to furnish their agents with adequate training (and, in the case of some newer agents, any training whatsoever) on the lawful execution of lawful operations, and to provide some sort of basic accountability for violations of the Constitution. Appellants instead "have proudly publicized the increasing numbers of arrests made as a result of the unconstitutional raids that continue to be carried out in the shadows and in the dark of night." (JA532.) Plaintiffs sought to hold accountable "those who conducted, directed, and sanctioned the complained-of conduct." (Id.)

According to Plaintiffs, the "nationwide pattern and practice" of unconstitutional conduct described above "has been the subject of widespread media reporting as well as

multiple lawsuits filed in other federal district courts." (JA559.) Plaintiffs cited to five lawsuits, all from outside this Circuit. (Id. (citing Barrera v. Boughton, No. 07-cv-1436 (D. Conn. Sept. 26, 2007); Aguilar v. ICE, No. 07-cv-8224 (S.D.N.Y. Sept. 20, 2007); Flores-Morales v. George, No. 07-cv-0050 (M.D. Tenn. July 5, 2007); Reyes v. Alcamtar, No. 07-cv-2271 (N.D. Cal. Apr. 26, 2007); Mancha v. ICE, No. 06-cv-2650 (N.D. Ga. Nov. 1, 2006)).) Members of Congress also allegedly raised questions about the raids. In a letter dated June 11, 2007, three legislators expressed their concerns about reports of misconduct occurring during raids executed in New Haven, Connecticut, on June 6, 2007 (i.e., ICE agents pushing their way into homes without search warrants, inappropriately treating both adults and children, and ultimately catching only four fugitives out of the thirty-one arrested). The raids were also allegedly criticized in a March 5, 2008 report by the United Nations Special Rapporteur on the Human Rights of Migrants. Plaintiffs alleged that reports of raids—and related misconduct—were especially prevalent in New Jersey, and they specifically cited to a number of newspaper articles purportedly describing incidents of misconduct dating from May 2006 to February 2008.

Plaintiffs included a whole section in their Second Amended Complaint entitled "Defendants' Supervisory Responsibility." (JA561 (emphasis omitted).) In this section, they again attempted to explain in more detail the four Appellants' alleged involvement in the unconstitutional conduct described above.

Accordingly, Plaintiffs made the following specific allegations with respect to Myers and Torres: (1) these two

13

Appellants oversaw the implementation of a five-fold increase in the number of FOTs between 2005 and 2007 and approved a "remarkable" 800% increase in the arrest quota for each team without providing the necessary training to prevent ICE agents, who now faced new pressures from the drastically increased quota, from acting abusively and unlawfully (id.); (2) Myers and Torres "facilitated the creation of a culture of lawlessness and lack of accountability within an agency they supervise" (id.); (3) in recent years, they "have been repeatedly on notice of the routine unconstitutional home-raid practices by ICE agents throughout the country," specifically because "defendants Myers and Torres have been sued numerous times for their roles in these practices" (id. (citing Aguilar (Myers and Torres); Flores-Morales (Myers); Mancha (Myers and Torres)); (4) the National Immigration Forum sent a letter on June 11, 2007 to Chertoff questioning the conduct of ICE agents in the June 2007 New Haven raids; (5) Myers herself responded to the National Immigration Forum correspondence in a letter dated July 6, 2007, in which she acknowledged that only five of the twenty-nine individuals arrested in New Haven were fugitive aliens, agents routinely lacked judicially-issued warrants and thereby had to obtain voluntary and knowing consent before entry, and (as emphasized by Plaintiffs) "such consent was ensured simply by assigning a Spanish-speaking officer to each Fugitive Operations Team" (JA562); (6) Torres possessed "direct responsibility for the execution of fugitive operations" and, like Myers, he was made aware of the unconstitutional home raid practices of his subordinates through the media and lawsuits filed against him dating back to November 2006; (7) also like Myers, Torres received specific notice of the misconduct in New Haven by means of a June 2007

14

telephone call from the city's own mayor claiming that ICE agents "'barged into houses without warrants and verbally abused the people and children were manhandled'" and asking whether "Torres's office should continue to allow such home raids to be conducted with these allegations pending" (id. (quoting JA317)); (8) despite their awareness of the unconstitutional home raid practices through lawsuits, Congressional inquiries, national media reports, and other sources, Myers and Torres repeatedly failed to conduct any meaningful investigations or provide any specific guidelines or training to ensure that such raids satisfied constitutional requirements and also, upon information and belief, failed to discipline any responsible agents in a meaningful fashion; and (9) on the contrary, Myers and Torres, "have contributed to such unlawful conduct by continuing to publicize, and laud as 'successful,' their department's dramatic increase in immigration arrests over the past two years" in several press releases, and their behavior further confirmed "that the high number of arrests were made pursuant to the nationwide interior immigration enforcement strategy announced by defendant Myers and Secretary Chertoff" (JA563 (citations omitted)).[5]

_____

[5] Plaintiffs also submitted to the District Court a June 13, 2008 newspaper article stating that New Jersey Senator Robert Menendez had raised serious concerns about overzealous and biased enforcement actions, including raids executed in New Jersey, in a meeting with Chertoff and Myers in May 2008. However, both officials purportedly disregarded his criticism and were "'in total denial.'" (JA441.)

15

Plaintiffs advanced a similar set of allegations with respect to Weber and Rodriguez: (1) as Newark DRO Field Office Directors, the two men were directly responsible for overseeing fugitive operations and the execution of Operation Return to Sender in New Jersey, and they both made frequent reports and public comments regarding the number of arrests and related matters; (2) "[c]omments to the media by each of them regarding allegations of inappropriate action by their fugitive operations personnel, including unconstitutional home raids, suggest that defendants Rodriguez and Weber at best acquiesced, and at worst, encouraged such behavior" (id.); (3) for example, when Weber was confronted by the press with specific allegations regarding a pattern of raids conducted without search warrants or consent, he was quoted in a newspaper article as saying that "'I don't see it as storming a home . . . . We see it as trying to locate someone'" (JA564 (quoting Elizabeth Llorente, Immigration Officials Say Raids On Illegals Are Within The Law, The Record (Hackensack, N.J.), Jan. 2, 2008)); and (4) upon information and belief, Weber and Rodriguez (a) knew that ICE agents were entering and searching New Jersey homes without search warrants and without the requisite consent, (b) failed to implement any guidelines, protocols, training, oversight, or record-keeping requirements to ensure that agents acted within constitutional limitations, (c) failed to conduct any substantial investigations into allegations of unconstitutional home raids of which they were made aware or otherwise discipline any responsible agent in a meaningful fashion, and (d) instead simply continued to publicize the "'successful'" increase in arrests in New Jersey over the past two years "while allowing the unconstitutional means for many of the arrests to continue unchecked" (id.).

16

We come to the actual causes of action asserted by Plaintiffs. In total, the Second Amended Complaint contained sixteen separate claims. The various federal Defendants, however, were only named in the first six claims. In particular, these six <u>Bivens</u> claims were: (1) a claim by all Plaintiffs for unreasonable home entries in violation of the Fourth Amendment; (2) a claim by all Plaintiffs for unreasonable home searches in violation of the Fourth Amendment; (3) a claim by all Plaintiffs for unreasonable seizures in violation of the Fourth Amendment; (4) a Fourth Amendment claim for excessive force by Chavez, Galindo, W.C., and Guzman; (5) a Fifth Amendment substantive due process claim by Chavez, Galindo, W.C., and Guzman; and (6) a Fifth Amendment equal protection claim by Ontaneda against all federal Defendants with the sole exception of ICE.

Each of these six <u>Bivens</u> claims contained an equivalent allegation specifically addressing the Appellants' alleged personal liability. The first claim, for instance, stated the following: "Upon information and belief, defendants Myers, Torres, Weber, and Rodriguez also participated in, directed, or knew of and acquiesced in the violation of plaintiffs' rights; tolerated past or ongoing misbehavior of this kind; or were deliberately indifferent to the risk that ICE officers, lacking clear training and under the pressure of sharply-increased quotas, would violate the Fourth Amendment rights of individuals suspected of being undocumented immigrants to the United States." (JA565.)

Finally, Plaintiffs sought relief in the form of compensatory, consequential, and punitive damages, attorney's fees, and an injunction against "all further intimidation of plaintiffs Walter Chavez, Ana Galindo, and

17

W.C., and any and all entry into the home of plaintiffs Walter Chavez, Ana Galindo, and W.C. absent a warrant issued by a judicial officer or informed, voluntary consent by either plaintiff Chavez or plaintiff Galindo."  (JA581.)

## B.    Procedural History and the District Court's Rulings

Plaintiffs filed their original Complaint on April 3, 2008, and they then filed an amended pleading on May 22, 2008.  The federal Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  On May 7, 2009, the District Court, for the most part, denied the motion.  Among other things, it specifically "ordered that Defendants' motion to dismiss claims against the Washington, D.C.-based supervisory defendants, Myers and Torres, for lack of personal jurisdiction is denied." (JA45 (emphasis omitted).)  It further "ordered that Defendants' motion to dismiss claims on the ground of qualified immunity against the four supervisory defendants, Myers, Torres, Weber, and Rodriguez is denied without prejudice" and allowed for "limited discovery" (in the form of interrogatories and a single deposition of each Appellant) as well as for the issue of qualified immunity to be raised again following this discovery.  (Id. (emphasis omitted).)  In its accompanying opinion, the District Court purported to apply the Supreme Court's ruling in Bell Atlantic v. Twombly, 550 U.S. 44 (2007), to the allegations against Appellants.  In short, it concluded that Plaintiffs sufficiently alleged that Appellants knew of and then acquiesced in the wrongdoing of their subordinates and thereby adequately stated a claim that Appellants possessed the degree of personal involvement required for liability under Bivens.

18

On May 18, 2009, the Supreme Court decided Iqbal. Appellants moved for reconsideration based on this new opinion, and, following the filing of the Second Amended Complaint on June 8, 2009 (which merely identified one of the previously anonymous Plaintiffs), moved to dismiss pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(6), and 15. On January 28, 2010, the District Court denied the motion to dismiss without prejudice "except with respect to plaintiff Ontaneda's equal protection claim which is dismissed." (JA64A.)

In its opinion, the District Court rejected Appellants' theory that the Supreme Court's decision worked a substantial change in the existing law governing the qualified immunity analysis and the liability of supervisors, at least in the specific circumstances presented by the current proceeding. Because Plaintiffs advanced claims under the Fourth Amendment, they were not required to show discriminatory purpose (unlike their counterpart in Iqbal who brought a claim of invidious discrimination under the First and Fifth Amendments). According to the District Court, they therefore adequately "allege that [Appellants] had actual knowledge, initiated, and directed their subordinate agents to go beyond the limits of their non-judicial warrants in violation of Plaintiffs' Fourth Amendment rights to be free from illegal searches and seizures." Argueta v. U.S. ICE, No. 08-1652, 2010 WL 398839, at *6 (D.N.J. Jan. 27, 2010). In other words, "there are sufficient factual allegations set forth in the Complaint for the Court, in applying its experience and common sense, to conclude that there is a plausible claim against each [Appellant] that their personal involvement, direction and knowledge or acquiescence permitted a search of the residence of plaintiffs without consent in violation of the

19

Fourth Amendment." Id. at *9. The District Court, however, did explain that Iqbal mandated the dismissal of the equal protection claim advanced by Ontaneda because Plaintiffs conceded that there was no direct evidence of any purposeful discrimination.

Appellants filed a timely notice of appeal. We subsequently allowed for the filing of two amicus briefs in support of Plaintiffs and the District Court's rulings, which were submitted by: (1) Amici Curiae Public Justice, the Prisoners' Rights Project of the Legal Aid Society of the City of New York, and the Pennsylvania Institutional Law Project; and (2) Amici Curiae LatinoJustice PRLDEF, the American Civil Liberties Union of New Jersey, the Asian American Legal Defense and Education Fund, and Catholic Charities of the Archdiocese of Newark.

II.

The District Court possessed subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs agree that this Court has appellate jurisdiction over Appellants' appeal from the District Court's qualified immunity rulings pursuant to the collateral order doctrine. In Iqbal, the Supreme Court determined that the denial of a motion to dismiss on qualified immunity grounds filed by the United States Attorney General and the FBI Director constituted an appealable collateral order. Iqbal, 129 S. Ct. at 1945-47. Pursuant to Iqbal, our appellate jurisdiction extends beyond merely determining whether the complaint avers a clearly established constitutional violation, and we also have the power to consider the sufficiency of the complaint itself. Id. at 1946-47. "[W]hether a particular complaint sufficiently

20

alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded." Id. at 1946. Accordingly, "the sufficiency of [a plaintiff's] pleadings is both 'inextricably intertwined with' and 'directly implicated by' the qualified immunity defense." Id. at 1946-47 (citations omitted). Because we dispose of this appeal on qualified immunity grounds, we need not—and do not—decide whether we also possess pendent appellate jurisdiction as to the District Court's denial of the motion to dismiss the individual capacity claims against Myers and Torres on personal jurisdiction grounds. We exercise plenary review over the District Court's qualified immunity rulings. See, e.g., Santiago v. Warminster Township, 629 F.3d 121, 128 (3d Cir. 2010); Atkinson v. Taylor, 316 F.3d 257, 261 (3d Cir. 2003).

III.

In Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court "'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" Iqbal, 129 S. Ct. at 1947-48 (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001)). It is also well established that government officials are immune from liability for damages where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted).

In this case, Plaintiffs never alleged in their Second Amended Complaint that Appellants actually adopted a facially unconstitutional policy. For instance, they did not claim that Appellants, as part of Operation Return to Sender,

21

ever ordered ICE agents to storm into homes without obtaining the requisite consent. Plaintiffs instead claimed that these four individuals should be held accountable because, among other things, they knew of—and nevertheless acquiesced in—the unconstitutional conduct of their subordinates. The District Court determined that Plaintiffs could pursue a claim under the Fourth Amendment based on a "knowledge and acquiescence" theory because the Fourth Amendment does not require proof of a discriminatory or unlawful purpose (and it further concluded that Appellants adequately alleged such a claim in their pleading). In response, Appellants have argued that: (1) at least after Iqbal, "knowledge and acquiescence," "failure to train," and similar theories of supervisory liability are not viable in the Bivens context and, on the contrary, a supervisor may be held liable only for his or her direct participation in the unconstitutional conduct; and (2) even under such now defunct theories of liability, Plaintiffs failed to allege a facially plausible Bivens claim against Appellants.

We recently observed that "[n]umerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after Iqbal." Santiago, 629 F.3d at 130 n.8 (citing Bayer v. Monroe Cnty. Children & Youth Servs., 577 F.3d 186, 190 n.5 (3d Cir. 2009); Dodds v. Richardson, 614 F.3d 1185, 1194 (10th Cir. 2010); Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010)). To date, we have refrained from answering the question of whether Iqbal eliminated—or at least narrowed the scope of—supervisory liability because it was ultimately unnecessary to do so in order to dispose of the appeal then before us. Id.; Bayer, 577 F.3d at 190 n.5. We likewise make the same choice here because we determine that Plaintiffs

22

failed to allege a plausible claim to relief on the basis of the supervisors' "knowledge and acquiescence" or any other similar theory of liability. Accordingly, we need not (and do not) decide whether Appellants are correct that a supervisor may be held liable in the Bivens context only if he or she directly participates in unconstitutional conduct.

## A. Iqbal, Liability of Supervisors, and Pleading Standards

We begin our analysis with the Supreme Court's own recent opinion in Iqbal. This case arose out of the federal government's response to the terrorist attacks on September 11, 2001, which the Court characterized as "'a national and international security emergency unprecedented in the history of the American Republic.'" Iqbal, 129 S. Ct. at 1953 (citation omitted).

The FBI and other entities within the Department of Justice began a massive investigation to identify the perpetrators and prevent any further attacks. Id. at 1943. A subset of 184 high-interest detainees were identified and held under special restrictions designed to prevent communication with either the general prison population or the outside world. Id. Iqbal, a citizen of Pakistan and a Muslim (who was arrested on immigration-related charges, pled guilty, and was eventually deported), was one of these high-interest detainees. Id. "The defendants [in his Bivens action] range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners [then-Attorney General Ashcroft and FBI Director Mueller]—officials who were at the highest level of the federal law enforcement

23

hierarchy." Id. (citations omitted). The complaint specifically alleged that "'the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11,'" and "'[t]he policy of holding post-September 11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001.'" Id. at 1944 (alteration in original) (citations omitted). The pleading posited that the two officials "'each knew of, condoned, and willfully and maliciously agreed to subject' respondent to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" Id. (alteration in original) (citation omitted). Finally, Ashcroft was named as the policy's "'principal architect,'" and Mueller was identified as being "'instrumental in [its] adoption, promulgation, and implementation.'" Id. (alteration in original) (citations omitted).

Ashcroft and Mueller unsuccessfully moved to dismiss the complaint for failure to include sufficient allegations showing their own involvement in clearly established unconstitutional conduct. Id. The Second Circuit affirmed this denial, but the Supreme Court reversed. Id. at 1944-45.

Following the example it set in Twombly, the Supreme Court indicated that, in order to assess the sufficiency of a complaint, it is first necessary to consider the underlying legal principles and elements implicated by the complaint. Id. at 1948. "In the limited settings where Bivens does apply, the implied cause of action is the 'federal analog to suits brought

24

against state officials under . . . § 1983.'" Id. (quoting Hartman v. Moore, 547 U.S. 250, 254 n.2 (2006)). It was therefore correct, the Court noted, for Iqbal to "concede[] that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Id. (citing, inter alia, Monell v. N.Y. City Dep't of Social Servs., 436 U.S. 658, 691 (1978); Dunlop v. Munroe, 7 Cranch 242, 269, 3 L. Ed. 329 (1812); Robertson v. Sichel, 127 U.S. 507, 515-16 (1888)). The Court accordingly stated that, "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. The Iqbal Court ultimately observed that "[i]n a § 1983 suit or a Bivens action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer." Id. at 1949.

As did Iqbal, Plaintiffs here admit that Appellants may not be held personally liable for damages pursuant to a respondeat superior or vicarious liability theory, and the District Court likewise acknowledged as much in its rulings. It is uncontested that a government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct. The District Court, in turn, dismissed Ontaneda's equal protection claim because there was no evidence that Appellants possessed the discriminatory intent required by Iqbal, and Plaintiffs themselves do not challenge this dismissal on appeal. However, as noted above, we assume for purposes of this appeal that a federal supervisory official may be liable in certain circumstances even though he or she

25

did not directly participate in the underlying unconstitutional conduct.

The District Court specifically concluded that a Fourth Amendment claim does not require a showing of a discriminatory purpose and that Plaintiffs could therefore proceed under a "knowledge and acquiescence" theory. Plaintiffs acknowledge that the "terminology" used to describe "supervisory liability" is "often mixed." (Appellees' Brief at 21.) They contend that a supervisor may be held liable in certain circumstances for a failure to train, supervise, and discipline subordinates. See, e.g., Chinchello v. Fenton, 805 F.2d 126, 132-34 (3d Cir. 1986) (applying § 1983 case law in evaluating and rejecting Bivens claim for failure to train, supervise, and discipline). We accordingly stated in a § 1983 action that "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); see also, e.g., Santiago, 629 F.3d at 129 ("Instead, Santiago's allegations appear to invoke a theory of liability under which 'a supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.'" (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)) (footnote omitted)). "It is also possible to establish section 1983 supervisory liability by showing a supervisor tolerated past or ongoing misbehavior." Baker v. Monroe Township, 50 F.3d 1186, 1191 n.3 (3d Cir. 1995) (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3d Cir. 1989)). We further indicated that a supervisor may be liable under § 1983 if he or she implements a policy or

26

practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct. See, e.g., Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001).

Having considered the legal framework implicated by Iqbal's complaint, the Supreme Court turned to the complaint itself. "Under Federal Rule of Civil Procedure 8(a)(2), a pleading  must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1949. While detailed factual allegations are not required, the pleading must include more than "an unadorned, the-defendant-unlawfully-harmed-me  accusation," "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s].'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 555, 557). Accordingly, the basic principle that a court must accept all allegations as true is inapplicable to either legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. (citing Twombly, 550 U.S. at 555). Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). This "plausibility" standard does not require probability, but it does demand more than a sheer possibility that the defendant acted unlawfully. Id. Therefore, a complaint pleading facts that are merely consistent with liability is insufficient. Id.

27

Following Twombly, the Supreme Court in Iqbal offered a multi-prong approach for determining whether a pleading meets the plausibility requirement. After identifying the elements that a plaintiff must plead to state a legally cognizable cause of action, see, e.g., Santiago, 629 F.3d at 130 & n.7, a court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" (although they may provide a helpful framework for the complaint), Iqbal, 129 S. Ct. at 1950. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

Applying that approach, the Court determined that Iqbal's complaint "has not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible.'" Id. at 1950-51 (alteration in original) (quoting Twombly, 550 U.S. at 570). It explained that certain conclusory and formulaic allegations were not entitled to any assumption of truth (specifically the allegation that Ashcroft and Mueller knew of, condoned, and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy solely on account of his religion, race, or national origin, and the respective characterizations of Ashcroft as the "'principal architect'" of this invidious policy as well as of Mueller as being "'instrumental'" in the policy's adoption and execution). Id. at 1951 (citations omitted). The Court then explained that the remaining factual allegations in the pleadings (specifically that the FBI, under the direction of Mueller, arrested and detained thousands of Arab Muslim men as part of the investigation and that the policy of holding detainees in highly restrictive conditions until cleared by the

28

FBI was approved by Ashcroft and Mueller in discussions in the weeks following the terrorist attack) were consistent with Ashcroft and Mueller acting on the basis of race, religion, or national origin. Id. But, "given more likely explanations, they do not plausibly establish this purpose." Id. The Iqbal Court specifically noted, among other things, the specific circumstances that confronted the nation's highest-ranking law enforcement officers in the wake of a devastating and unprecedented attack. Id. at 1951-52.

The Supreme Court also expressly rejected Iqbal's theory that the pleading standards should be tempered where discovery purportedly was to be structured in such a way as to preserve the qualified immunity defense. Id. at 1953-54. Instead, it emphasized that the "basic thrust" of qualified immunity is to free officials from the concerns and burdens of litigation, including discovery. Id. at 1954 (citation omitted). "If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed." Id. The Court emphasized that such "costs are only magnified when Government officials are charged with responding to . . . 'a national and international emergency unprecedented in the history of the American Republic.'" Id. (citation omitted). Ultimately, the Supreme Court believed that the elusive promise of minimally intrusive discovery furnished "especially cold comfort" in light of the need to "give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." Id. at 1954.

29

**B. The Sufficiency of Plaintiffs' Second Amended Complaint**

Having addressed the legal elements that a plaintiff must plead to state a legally cognizable claim, we turn to the remaining steps identified by Iqbal: (1) identifying those allegations that, because they are no more than conclusions, are not entitled to any assumption of truth; and (2) then determining whether the well-pleaded factual allegations plausibly give rise to an entitlement to relief. See, e.g., Iqbal, 129 S. Ct. at 1950; Santiago, 629 F.3d at 129-30. We acknowledge that Plaintiffs filed an extensive and carefully drafted pleading, which certainly contained a number of troubling allegations especially with respect to alleged unconstitutional behavior on the part of lower-ranking ICE agents. Plaintiffs are also correct that, even after Iqbal, we must continue to accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and then determine whether a reasonable inference may be drawn that the defendant is liable for the alleged misconduct. See, e.g., Fowler v. UMPC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). We also recognize that Iqbal made it clear that courts must determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim and that such a plausibility requirement "is not akin to a 'probability requirement.'" Iqbal, 129 S. Ct. at 1949; see also, e.g., Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1322-25 (2011). Nevertheless, we ultimately conclude that, like Iqbal, Plaintiffs failed to allege a plausible Bivens claim against the four Appellants.

Initially, certain allegations in the Second Amended Complaint were conclusory in nature and merely provided, at

best, a "framework" for the otherwise appropriate factual allegations. Iqbal, 129 S. Ct. at 1950. For instance, the broad allegations regarding the existence of a "culture of lawlessness" are accorded little if any weight in our analysis. (See JA532, JA561.) We further note that the relevant counts in the pleading contained boilerplate allegations mimicking the purported legal standards for liability, which we do not assume to be true. We also must reject certain broad characterizations made by the District Court, which were not supported by either the actual factual allegations in the Second Amended Complaint or reasonable inferences from such allegations. Most significantly, the District Court went too far by stating that Myers and Torres "worked on these issues everyday." Argueta, 2010 WL 398839, at *8.

Turning to the non-conclusory factual allegations in the Second Amended Complaint, we begin with the critical issue of notice. Plaintiffs did reference an impressive amount of documentation that allegedly provided notice to Appellants of their subordinates' unconstitutional conduct. However, these alleged sources of notice were fatally flawed in one way or another. Broadly speaking, we must point out the typical "notice" case seems to involve a prior incident or incidents of misconduct by a specific employee or group of employees, specific notice of such misconduct to their superiors, and then continued instances of misconduct by the same employee or employees. The typical case accordingly does not involve a "knowledge and acquiescence" claim premised, for instance, on reports of subordinate misconduct in one state followed by misconduct by totally different subordinates in a completely different state. Although there were some New Jersey-specific allegations in the Second Amended Complaint, we are generally confronted here with an attack on the alleged

31

misconduct of numerous ICE agents at different raids executed across the country over a period of years. As Appellants further point out, the court cases specifically cited in Plaintiffs' pleading either did not involve individual capacity claims against Myers and Torres, were filed after at least some of the New Jersey raids specifically alleged in the Second Amended Complaint took place, or did not even involve Operation Return to Sender. All of these cases were also filed outside of New Jersey, and certain other alleged sources of notice implicated raids that took place in other states, especially in New Haven, Connecticut. Likewise, some alleged sources (like the February 2008 hearing and the March 2008 UN report) post-dated most of the specific New Jersey raids that allegedly harmed Plaintiffs themselves. In the end, we conclude that Plaintiffs did not plausibly allege that the Appellants had legally sufficient notice of the underlying unconstitutional conduct of their subordinates.

Second, we observe that allegations specifically directed against Appellants themselves (unlike the allegations directed at the agents who actually carried out the raids) described conduct consistent with otherwise lawful behavior. See, e.g., Iqbal, 129 S. Ct. at 1950. In other words, a federal official specifically charged with enforcing federal immigration law appears to be acting lawfully when he or she increases arrest goals, praises a particular enforcement operation as a success, or characterizes a home entry and search as an attempt to locate someone (i.e., a fugitive alien). In fact, the qualified immunity doctrine exists to encourage vigorous and unflinching enforcement of the law. See, e.g., id. at 1953-54. We add that, far from adopting a facially unconstitutional policy or expressly ordering ICE agents to engage in unconstitutional home entries and searches, Myers

32

clearly stated in her response to the National Immigration Forum correspondence that agents were required to obtain consent before entering private residences and that all allegations of misconduct were taken seriously and fully investigated (and that, among other things, similar statements were made by Weber in connection with his "'[w]e see it as trying to locate someone" comment to the press).

We also agree with Appellants' assertion that Plaintiffs themselves did not really identify in their pleading what exactly Appellants should have done differently, whether with respect to specific training programs or other matters, that would have prevented the unconstitutional conduct. See, e.g., Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001); Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). For instance, the Inspector General's report, emphasized in the Second Amended Complaint, actually stated that all FOT members were required to complete a special three-week basic training course within two years of their assignment, most officers had completed the requisite training, and, in any case, all team members had previously undergone some form of basic law enforcement training (which presumably would have covered basic principles governing, among other things, the entry into a private residence without a judicial warrant). Far from recommending a complete training overhaul, the Inspector General ultimately recommended a "refresher course," and ICE accepted this recommendation. (JA277.)

We also cannot overlook the fact that Appellants themselves occupied relatively high-ranking positions in the federal hierarchy. Following the example set by the District Court, Plaintiffs assert that Appellants cannot be compared with Attorney General Ashcroft, who held the highest

33

position in the federal law enforcement hierarchy. They add that the Iqbal Court emphasized that both Ashcroft and Mueller had to make quick policy decisions to respond to an unprecedented national emergency, while, on the other hand, Appellants oversaw Operation Return to Sender over a number of years. We certainly acknowledge that it is crucial to consider context and the particular circumstances of each and every case. See, e.g., Iqbal, 129 S. Ct. at 1950. However, the context here involved, at the very least, two very high-ranking federal officials based in Washington D.C. who were charged with supervising the enforcement of federal immigration law throughout the country (as well as two other officials responsible for supervising such enforcement throughout an entire state). Appellants accordingly note that Myers and FBI Director Mueller reported directly to their respective agency heads (the Secretary of Homeland Security and the Attorney General), were appointed by the President and confirmed by the Senate, and were responsible for setting national and international polices. In fact, it appears uncontested that Myers and Torres oversaw an agency with more than 15,000 employees and a budget of more than $3.1 billion.

In Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988), a civilian employee of the Pennsylvania State Police filed a civil rights action under § 1983 and 42 U.S.C. § 1985 against several defendants, including Pennsylvania Governor Thornburgh and Attorney General Zimmerman, id. at 1197-98. Among other things, she alleged that she was a victim of unlawful retaliation in the form of an unlawful work suspension and impermissible changes in her duties and working conditions. Id. Affirming the district court's dismissal of her claims against these two state officials, this

Court specifically determined that she failed "to allege knowledge and acquiescence with the required particularity" as to her claim against the Governor. Id. at 1208. We observed that "Rode's assertion that the Governor had 'responsibility for supervising' the other defendants is irrelevant." Id. We then expressly rejected her "hypothesis" that the Governor had personal knowledge of the retaliation "directed against Hileman [Rode's co-plaintiff] because of numerous articles that appeared in newspapers throughout the state and through the introduction of a legislative resolution seeking an investigation into racially motivated retaliation against [Pennsylvania State Police] employees, the filing of grievances with the Governor's office of administration, and telephone calls and correspondence with the office of the Lieutenant Governor." Id. In the end, we concluded that, "[i]n a large state employing many thousands of employees, a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor's office of administration or to the Lieutenant Governor's office." Id.

We add that the Ninth Circuit reached the same result in a recent post-Iqbal decision. In al-Kidd v. Ashcroft, 580 F.3d 949 (9th Cir. 2009), rev'd on other grounds, --- S. Ct. ---, 2011 WL 2119110 (May 31, 2011), the Ninth Circuit expressly rejected a "conditions of confinement" claim against Ashcroft brought by an individual detained under the material witness statute following September 11 because "the complaint does not allege any specific facts—such as statements from Ashcroft or from high-ranking officials in the DOJ—establishing that Ashcroft had personal involvement in setting the conditions of confinement." Id. at 978. The Ninth Circuit acknowledged that al-Kidd made several allegations

35

regarding media reports and other sources of information describing the conditions of confinement, but it then explained that "the non-specific allegations in the complaint regarding Ashcroft's involvement fail to nudge the *possible* to the *plausible*, as required by Twombly." Id. at 978-79; see also, e.g., Santiago, 629 F.3d at 134 (concluding that "allegation that Lt. Springfield was placed in charge of the operation, coupled with what happened during the operation, [failed to make it] plausible that Lt. Springfield knew of and acquiesced in the use of excessive force against Santiago.").

We acknowledge that the specific circumstances presented in this prior case law may be distinguishable in one way or another. For instance, the appointed head of a federal agency, charged with enforcing the law and specifically implementing a particular enforcement operation, clearly possessed different responsibilities than the elected governor of a state. See, e.g., Atkinson, 316 F.3d at 270-71 (distinguishing state correctional commissioner and lower-ranking officials from governor and state attorney general). However, we cannot overlook the marked similarities between the allegations at issue here and the allegations deemed to be insufficient in Rode and al-Kidd. Furthermore, we again note that Myers and Torres, in particular, had national and even international policymaking and supervisory responsibilities. In the end, we believe that this prior case law supports our conclusion that Plaintiffs failed to meet the plausibility requirement.[6]

---

[6] We further note that the Supreme Court's recent ruling in Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309 (2011), does not alter our conclusion in the current matter. The Court considered a motion to dismiss a securities fraud

Finally, we wish to emphasize that our ruling here does not leave Plaintiffs without any legal remedy for the alleged violation of the United States Constitution. Chavez, Galindo, and W.C. are still free to pursue their official capacity claims for injunctive relief against any further intimidation or unlawful entry into their home. Also, we do not address Plaintiffs' individual capacity claims for damages against the lower-ranking ICE agents named in the Second Amended Complaint. See, e.g., Iqbal, 129 S. Ct. at 1952 ("It is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief from petitioners [Ashcroft and Mueller].").

IV.

For the foregoing reasons, we will reverse the District Court's order denying the motion to dismiss the individual capacity claims for damages against Appellants on qualified immunity grounds. We will remand for further proceedings consistent with our opinion.

---

claim against a pharmaceutical company for its alleged failure to disclose reports of adverse events associated with one of its drugs. Id. at 1313-25. Unlike in Iqbal, the Matrixx Court did not address a Bivens action against high-ranking federal officials. Id.