PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3849
_____

ERICK RODOLFO OLIVA-RAMOS,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent.

_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  The Honorable Linda S. Wendtland
(No. A088-231-019)
_____

Argued
November 16, 2011

Before: McKEE, *Chief Judge*, RENDELL and AMBRO,
*Circuit Judges*

(Opinion filed: September 13, 2012)

Nancy Morawetz, Esquire
Alina Das, Esquire
Nikki R. Reisch, Law Student (argued)
Stephen Kang, Law Student
Ruben Loyo, Law Student
Nancy Steffan, Law Student
Washington Square Legal Services, Inc.
245 Sullivan St., 5th Floor

New York, NY 10012

Counsel for Petitioner

Allen W. Hausman, Esquire (Argued)
Andrew J. Oliveira, Esq.
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

Timothy E. Hoeffner, Esq.
DLA Piper
1650 Market Street
One Liberty Place, Suite 4900
Philadelphia, PA 19103

AMERICAN CIVIL LIBERTIES UNION
Amicus Appellant
_____

OPINION OF THE COURT
_____

McKEE, *Chief Judge*.

Erick Oliva-Ramos petitions for review of an order of the Board of Immigration Appeals affirming an Immigration Judge's order removing him to Guatemala. He also seeks review of the BIA's denial of his motion to supplement the record and to reopen his removal proceeding before an Immigration Judge.[1] We must decide whether the BIA erred in refusing to apply the exclusionary rule in a removal proceeding under the circumstances in this case. A related question that we must address is whether the BIA abused its

---

[1] We consolidated the petition for review of the BIA's denial of his motion to reopen with our review of the underlying removal order pursuant to 8 U.S.C. § 1252(b)(6).

discretion in not reopening this case to allow Oliva-Ramos to supplement the administrative record with evidence of widespread and/or egregious conduct by Immigration and Customs Enforcement ("ICE") officials. Finally, we must determine if alleged violations of regulations entitle Oliva-Ramos to relief. For the reasons explained below, we will grant the petitions, vacate the BIA's order of removal, and remand to the BIA for further proceedings consistent with this opinion.[2]

## I. Factual Background

At 4:30 a.m. on March 26, 2007, a team of armed, uniformed ICE officers repeatedly rang the entrance "buzzer" to the Englewood, New Jersey apartment where Erick Oliva-Ramos lived. Oliva-Ramos shared the home with his three sisters (Clara, Wendy, and Maria), his nephew (Wagner), and his brother-in-law (Marvin). Two visiting family friends were also in the apartment. Of those present, only Clara could prove that she was legally in the United States.

According to the affidavit that was introduced at Oliva-Ramos's removal hearing, Clara heard the incessant buzzing, but could not tell who was ringing the bell because the intercom was broken.[3] Since it was 4:30 a.m., she

---

[2] The BIA granted Oliva-Ramos's request for voluntary departure but that order automatically terminated upon the filing of the motion to reopen and the petition for review, and the alternate order of removal immediately took effect. *Sandie v. Att'y Gen.*, 562 F.3d 246, 255 n.5 (3d Cir. 2009) (citing 8 C.F.R. § 1240.26(f)).

[3] The IJ noted that although Oliva-Ramos submitted affidavits from Clara, Marvin, and Wagner, those family members were "not present in court and unavailable for cross-examination by the Department of Homeland Security." The IJ "weighed [these] document[s] accordingly." The IJ considered the affidavit of Clara Oliva to the extent that it corroborated the testimony of the Government's witness on consent to enter the home, but did not explicitly state additional credibility determinations as to the weight of affidavits from family members not present at the suppression hearing.

remotely opened the building's entry door because she feared that the repeated buzzing signaled an emergency. While in her pajamas, she stepped onto the landing outside her apartment as she held her apartment door open with her foot and saw five or six ICE officers coming up the stairs.

As the officers approached the front door of the apartment, they waived an administrative warrant for Oliva-Ramos's other sister, Maria. Clara later stated that she realized that the people coming up the stairs were ICE agents when they said they had an order to arrest Maria. The officers had no information about the identity or legal status of any of the other occupants of the apartment. Before entering the apartment, the officers asked Clara for her name and immigration status, and she informed them that she was a legal permanent resident. The officers then asked if Clara lived in the apartment and asked permission to enter. In her affidavit, Clara explained that she did not deny entry even though Maria was not there because she (Clara) believed that she could not refuse and that the order to arrest Maria gave the officers the right to enter even in Maria's absence.

At some point during the exchange with the officers, Clara lost her foothold on the open door and it slammed shut, leaving her outside the apartment. Her son let her in, however, after she banged on the door. As she entered, the officers lined up behind her and followed her inside. Once inside, they began waking the occupants and ordering them into the living room while another agent blocked the door so that no one could leave.

According to Oliva-Ramos's affidavit and testimony before the IJ, Clara knocked on his bedroom door and told him that immigration officers were there. Oliva-Ramos shared his bedroom with his sister, Wendy, and her husband. Oliva-Ramos was sleeping, but Wendy opened the bedroom door.[4]

_____

[4] Since it was before dawn, the bedroom lights were turned off.

4

An armed officer in a green ICE uniform shone a flashlight into the room and ordered everyone to move to the living room. Oliva-Ramos was in his pajamas but was permitted to get dressed under the supervision of an ICE officer. He testified that "there was no way [he] could have left" the presence of the officers.

The officer then directed Oliva-Ramos to the living room and told him to sit down. In addition, Oliva-Ramos testified that the officer did not identify himself, show him a badge or identification, or tell him why he (the officer) was in the apartment. During the removal hearing, Oliva-Ramos also testified that he was not told that he could refuse to go with the officer.[5]

After everyone was escorted to the living room, five or six armed ICE officers began questioning everyone about Maria. During that questioning, the officers blocked each entrance to the living room. Oliva-Ramos testified that he heard an officer tell Clara to sit down when she tried to stand. He also said he heard the officer tell her that if she did not sit, she could be arrested. The officers asked about the identities and nationalities of all of the apartment occupants. Clara's son, Wagner, initially refused to answer questions, but relented when the officers ordered him to speak and told him he could not refuse to answer them.

The officers did not ask Oliva-Ramos any questions in the living room but ordered him back to his bedroom to retrieve his identification documents. An officer followed Oliva-Ramos to the bedroom as he retrieved his identification and escorted him back to the living room. Oliva-Ramos stated that he went to retrieve his documents because he thought that, if he did not go, he could be arrested because he did not have papers. He also thought that if he showed his Guatemalan identification to the officer, nothing would happen. The documents he retrieved revealed that he is a citizen of Guatemala; he was unable to produce any

---

[5] Oliva-Ramos testified that he was nervous and that an officer followed him from the bedroom to the living room.

documentation demonstrating that he was lawfully present in the United States.

The encounter lasted approximately forty-five minutes. During that time, Oliva-Ramos and his family were prevented from eating, drinking, or speaking out of turn. According to Clara's affidavit, her sister (Wendy) began menstruating while the family was in the living room, but Clara was not allowed to get any feminine hygiene products for her. According to Oliva-Ramos's affidavit, although Wendy and Oliva-Ramos were eventually allowed to use the bathroom, they had to leave the door open while an ICE officer stood outside the door, thus denying them the most rudimentary considerations of privacy.

Clara was able to document that she was legally in the United States. All others were eventually handcuffed, placed in an ICE van and driven around while the officers made several more raids. At each stop, the agents followed a similar pattern of knocking on doors and making general inquiries about the legal status of all of the occupants in a residence. These stops resulted in two more individuals being placed in the van.

At around 7:00 a.m., Oliva-Ramos and his family arrived at the ICE office, where they were placed in a detention room containing an open toilet. Oliva-Ramos testified that there he was told to fill out papers written in Spanish, and he was given the option of signing them. He had to wait until the afternoon before he was questioned.[6] He claims that neither he nor his relatives were given food nor water in the interim. The ICE officers who conducted the raid eventually interviewed the detainees. Oliva-Ramos was interviewed by ICE Officer Marlene Belluardo. After being interviewed, Oliva-Ramos was charged with being removable and was taken to a detention facility. While there, he was informed of his right to a lawyer and given a list of free legal service providers. Between 6:00 and 7:00 p.m., he was finally given the first food that he had been allowed to eat during his 15-hour ordeal.

---

[6] He stated that he was not told that he had a right to remain silent or that his answers could be used against him in a court of law.

## A. Immigration Court Proceedings

During the ensuing removal proceedings, Oliva-Ramos testified on his own behalf with the assistance of a Spanish interpreter. He was cross-examined about the raid, his arrest, and his examination at the ICE office. He also presented the supporting affidavits of Clara, Wagner, and Marvin, although they were not present in court to testify.

The Government presented only one witness, the arresting and interviewing ICE officer, Marlene Belluardo. Officer Belluardo testified that she had taken part in "hundreds" of home raids since participating in the raid at Oliva-Ramos's apartment on March 26, 2007, but had no independent recollection of the raid that led to Oliva-Ramos's detention. Officer Belluardo stated that she does not remember anything about the apprehension, but acknowledged her participation based upon having filled out Form I-213, the Record of Deportable/Inadmissible Alien, which listed her as an arresting officer.[7] She testified about the general procedures used in ICE field operations, but her only knowledge of Oliva-Ramos came from the I-213 form. Officer Belluardo recognized him from the picture contained on the I-213 form. She testified that she received three months' training on how to conduct investigative work, how to look for subjects with warrants, and about the confines of the Fourth Amendment.

Belluardo also testified about the standard protocol for fugitive operations. She said that when she goes to a home with a warrant, it is a "knock warrant," which is an administrative warrant. Someone has to respond to her knock on the door and grant permission to enter, as an officer is only permitted to enter with permission. Officer Belluardo confirmed that there was no warrant for Oliva-Ramos but only a deportation warrant for Maria. Belluardo testified that it is standard protocol to get everyone in the house to a central location so that the officers can identify the subject and anyone else in the house. In addition, she testified that everyone is brought into the living room as a central area of safety for everyone in the house. Each person is asked his or

---

[7] Three officers were listed as arresting officers.

her identity, and any person found to be in the United States without documents or with questionable documents is taken into custody. Finally, Officer Belluardo testified that, when apprehending a suspect, questions asked are usually just to identify the person and that no other questions are asked until they are taken into custody and transported to the processing area.

The Government also presented the following four documents to support its charge of removability: Form I-213, the Record of Deportable/Inadmissible Alien; Form I-215B, the affidavit of Erick Oliva-Ramos; the face page of a Guatemalan passport; and a Guatemalan consular identification card. Oliva-Ramos objected to that evidence and moved to preclude consideration of all of the Government's evidence obtained during the raid of his apartment and his subsequent arrest. He argued that the evidence had been obtained by exploiting violations of the Fourth Amendment that were both egregious and widespread, and thus the exclusionary rule should apply. He also moved to terminate the proceedings, and requested an evidentiary hearing on his suppression motion.

The Immigration Judge denied the motion to suppress and the motion to terminate the proceedings. As a threshold matter, the IJ noted that the Government did not dispute that Oliva-Ramos had been detained without a warrant. However, the IJ cited to BIA authority that had relied on *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), wherein the BIA had stated: "[E]ven assuming a warrantless arrest, the exclusionary rule, which requires a court to suppress evidence that is the fruit of an unlawful arrest or of other official conduct that violates the [F]ourth [A]mendment, does not apply in deportation proceedings." The IJ concluded that "[i]n removal proceedings . . . an alien cannot generally suppress evidence asserted to be procured in violation of the Fourth Amendment unless the alleged violation(s) are so egregious as to 'transgress notions of fundamental fairness.'" (citing *Lopez-Mendoza*, 468 U.S. at 1050-51).

In rejecting Oliva-Ramos's argument that the Government had entered his home without valid consent in violation of 8 C.F.R. § 287.8(f)(2) (2008), the IJ relied on the

Government's assertion that "consent was obtained prior to immigration officers entering the Respondent's residence from a 'person in control of the site to be inspected,' namely, the Respondent's sister, Clara Oliva."[8]  The IJ explained: "[T]he I-213 clearly indicates that consent to enter the residence was obtained from Clara Oliva, and that ICE had a warrant for Maria Oliva at that address."  In weighing the testimony, the IJ noted that "Ms. Belluardo testified that she ha[d] no independent recollection of the specific events of Respondent's detention, and her testimony is based on the facts as documented in the I-213 which she prepared in the ordinary course of business immediately following the Respondent's detention."  The IJ also relied on Officer Belluardo's testimony that "obtaining consent prior to entry is consistent with training ICE officers, including her, receive in the course of employment with DHS."  In addition, the IJ stated that Oliva-Ramos's testimony, and his sister Clara Oliva's affidavit, were consistent with the testimony of Officer Belluardo and the I-213.  Thus, the IJ found that "consent to enter the residence at 97A Palisade Avenue was properly obtained prior to ICE officers' entry into the

---

[8] 8 C.F.R. § 287.8(f)(2) states in relevant part: "An immigration officer may not enter into the non-public areas of a . . . residence including the curtilage of such residence, . . . except as provided in section 287(a)(3) of the Act, for the purpose of questioning the occupants . . . concerning their right to be . . . in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected."
 The referenced exception found in Section 287(a)(3) of the Immigration and Nationality Act relates to border searches.  8 U.S.C. § 1357(a)(3), 66 Stat. 233, INA § 287(a)(3) (2006) ("Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant-- . . . within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.").

residence." The IJ did not, however, evaluate any of the evidence relevant to whether circumstances might have existed to invalidate the alleged "consent" or to determine if the circumstances here implicated the exception to the nonapplication of the exclusionary rule in removal proceedings under *Lopez-Mendoza* that we discuss in detail below.

Moreover, the IJ ruled that the documents Oliva-Ramos sought to suppress were contained in what is known as an "A" file. The IJ relied upon *United States v. Herrera-Ochoa*, 245 F.3d 495, 498 (5th Cir. 2001), in asserting that an alien maintains no legitimate expectation of privacy in that file, and therefore lacks standing to challenge its introduction into evidence.

Oliva-Ramos also sought to subpoena testimony of the additional ICE officers who were involved in his seizure as well as certain documents that the Government had not produced pursuant to Oliva-Ramos's Freedom of Information Act request ("FOIA").[9] Specifically, Oliva-Ramos sought the production of documents related to the search and seizure of his home and arrest, training manuals and documentation of the ICE Fugitive Operation Task Force, relevant ICE policy and procedures, and records related to the ICE officers who arrested him. In addition, Oliva-Ramos moved to subpoena the ICE officers who participated in his arrest. Although the IJ indicated that she wanted to address the subpoenas at an individual merits hearing, she never ruled on the motion to subpoena the additional documents and witnesses.

At a later hearing on removability, the IJ found Oliva-Ramos removable as charged but granted his request for voluntary departure. Oliva-Ramos then appealed to the Board of Immigration Appeals.

### B. Board of Immigration Appeals Proceedings

The BIA first considered Oliva-Ramos's Fourth Amendment claim that the Government had obtained evidence of alienage without proper consent through coercion

---

[9] *See* 5 U.S.C. § 552 (1982).

and duress during the raid of his home. The BIA declined to address the claim as presented and cited to *Lopez-Mendoza*, explaining that "the Fourth Amendment exclusionary rule is generally not applicable in civil removal proceedings." In a lengthy footnote, the BIA acknowledged the following language in *Lopez-Mendoza* on which Oliva-Ramos based his Fourth Amendment claim:

> We are mindful that [in *Lopez-Mendoza*] a plurality of the United States Supreme Court opined that, in removal proceedings, "egregious violations of the Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence" might potentially warrant a reconsideration of the exclusionary rule's role in civil removal proceedings. *INS v. Lopez-Mendoza*, *supra*, at 1050-51. . . . Further, as the respondent makes the argument that the DHS engages in "widespread" violations of the Fourth Amendment (Respondent's Br. at 42), we acknowledge that the Supreme Court provided for the prospective contingency that its "conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread." *Id.* at 1050. (citation omitted). However, first, these comments from a plurality of the Supreme Court are obiter dictum; second, no such "good reason to believe" has yet arisen in the eyes of the Supreme Court; and, third, our own precedents, by which we are bound, recognize no such exception to the inapplicability of the exclusionary rule premised on widespread Fourth Amendment violations . . . .

The BIA also acknowledged that its precedential decisions "have provided for the exclusion of evidence against an alien in 'fundamentally unfair' circumstances." The Board then noted that "this principle of fundamental fairness is rooted in notions of due process of law, not in the Fourth Amendment

11

exclusionary rule." Thus, to the extent that the Board considered Oliva-Ramos's argument at all, it did so "in terms of due process requirements."

The BIA found that the Government had satisfied its initial burden of establishing alienage through the evidence that Oliva-Ramos sought to suppress, including the Form I-213 and Form I-215B, as well as his Guatemalan passport and identification card. The BIA also concluded that Oliva-Ramos had not rebutted that evidence prior to receiving a grant of voluntary departure. The BIA did not believe that any regulatory violations altered the outcome because the documents the Government presented "[were] inherently reliable and were not shown to have been created under impermissible coercion and duress."

The BIA then considered Oliva-Ramos's challenges to certain administrative regulations governing ICE conduct. First, it considered Oliva-Ramos's coercion claim that the Government impermissibly threatened and coerced him when it inspected the non-public, interior areas of his residence, in violation of 8 C.F.R. § 287.8(f)(2).[10] The BIA cited to the IJ's finding "that the DHS first obtained the consent of one of the respondent's familial cohabitants before entering the premises." Since the BIA did not believe that the conclusion was clearly erroneous, the BIA relied upon that finding when considering all of Oliva-Ramos's claims.[11]

---

[10] The BIA relied on *Leslie v. Att'y Gen.*, 611 F.3d 171, 180 (3d Cir. 2010), for the principle that "when an agency promulgates a regulation protecting fundamental statutory or constitutional rights of parties appearing before it, the agency must comply with that regulation. Failure to comply will merit invalidation of the challenged agency action without regard to whether the alleged violation has substantially prejudiced the complaining party."

[11] The BIA also stated that it independently "considered the respondent's asserted bases for contending that the consent to the officers' entry was coerced (or otherwise invalid) but [was] not persuaded by them."

12

Second, Oliva-Ramos claimed that the Government had violated 8 C.F.R. § 287.8(b)(1) by impermissibly restraining his freedom through threats and coercion during the inspection and investigation of his home. However, the BIA reasoned that INA § 287(a)(1), the statute under which § 287.8(b)(1) was promulgated, permits warrantless interrogation if ICE officers reasonably believe that a person may be unlawfully in the United States. The BIA concluded that requirement was satisfied once Oliva-Ramos presented his Guatemalan passport and identification. The BIA also relied on Oliva-Ramos's own testimony before the IJ that he had no intention of leaving the apartment because he "didn't commit any crime." During the hearing before the IJ, he had been asked: "[W]hat would have happened if you'd asked the officers to leave?" He responded, "I couldn't tell the officers to leave because it's the law and I didn't have anything to tell them."

Third, Oliva-Ramos argued that the Government violated 8 C.F.R. § 287.8(c)(2)(i) when it arrested him without first obtaining a warrant. The BIA rejected that claim because INA § 287(a)(2) specifically authorizes warrantless arrests where ICE officers have reason to believe that someone is here in the United States illegally and poses a risk of flight if not detained. *See also* 8 C.F.R. § 287.8(c)(2)(ii). The I-213 stated: "A field interview revealed that the subject was an alien unlawfully present in the United States and he was arrested without a warrant in that he appeared to be a flight risk."

The BIA also rejected Oliva-Ramos's claims that regulatory violations that did not implicate the Fourth Amendment entitled him to relief. The BIA did not believe that Oliva-Ramos had established a violation of 8 C.F.R. §§ 287.3(c) or 292.5(b) because he had been properly advised as required before formal removal proceedings were initiated.[12]

---

[12] 8 C.F.R. § 287.3(c) provides in relevant part:
> [A]n alien arrested without warrant and placed in formal proceedings . . . will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien

13

The BIA also rejected Oliva-Ramos's argument that his examination by the same DHS officer who had arrested him in violation of 8 C.F.R. § 287.3(a) entitled him to relief. That regulation provides that "[a]n alien arrested without a warrant . . . will be examined by an officer other than the arresting officer."[13]

The BIA similarly rejected Oliva-Ramos's final regulatory claim that DHS had violated 8 C.F.R. § 287.8(d)(1) when it left him and his fellow detainees locked and unattended in a van several times during a two-hour

---

with a list of the available free legal services provided by organizations and attorneys qualified . . . that are located in the district where the hearing will be held. The examining officer shall note on Form I–862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

8. C.F.R. § 292.5(b) provides in relevant part: "Whenever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney or representative who shall be permitted to examine or cross-examine such person and witnesses, to introduce evidence, to make objections . . . and to submit briefs."

[13] The BIA held that this particular section requires a demonstration of prejudice, unlike several of the other regulatory provisions that do not require a showing of prejudice under *Leslie*. The BIA did not reach the question of prejudice. It concluded that Oliva-Ramos had not testified that he was arrested by the same agent who examined him after the arrest because he could not remember Officer Belluardo being present during the raid. As discussed above, Officer Belluardo had no independent recollection of this particular home raid but conceded that she was likely present since she filled out the Form I-213 for the investigation of Oliva-Ramos's home.

period while transporting them to the detention facility.[14] The BIA rejected that contention because Oliva-Ramos had not established a regulatory violation. He had not testified before the IJ about any periods of time when he was left in the van. The BIA noted that Oliva-Ramos had merely directed the IJ's attention to an affidavit drafted before the suppression hearing.[15]

The BIA then turned its attention to two allegations of misconduct by the IJ. First, it considered Oliva-Ramos's allegation that a translator had improperly translated the Spanish word "arma" into the English word "arm" in the sense of a body part as opposed to an armament or firearm. The BIA found no due process violation because it concluded that "the word was conscientiously translated and . . . all the parties present understood the respondent." Second, Oliva-Ramos alleged that the Immigration Judge demonstrated improper bias but the BIA found that the transcript of the hearing before the IJ reflected "that the Immigration Judge conducted the sometimes contentious and inherently difficult proceedings fairly." Thus, the BIA found no due process violations with respect to the IJ's conduct of the removal proceedings.

Finally, the BIA considered a motion to remand the proceedings to the Immigration Judge to consider new evidence that was not presented to the IJ. On February 18, 2009, while his appeal was pending before the BIA, Oliva-Ramos moved to present previously unavailable evidence of alleged widespread Fourth Amendment violations by ICE

---

[14] 8 C.F.R. § 287.8(d)(1) provides in relevant part: "All persons will be transported in a manner that ensures the safety of the persons being transported. . . . The person being transported shall not be left unattended during transport unless the immigration officer needs to perform a law enforcement function."

[15] It appears that the BIA also required prejudice because it found that this alleged regulatory violation did not "implicate fundamental statutory or constitutional rights at play *in the respondent's removal proceeding.*"

officials.[16]　He stated that on October 4, 2007, he had requested many documents relating to the procedures employed by the Fugitive Operations Teams that conducted the raid of his home. The Government had denied his FOIA request for these documents, citing FOIA Exemptions 2 and 7(E).[17]　Oliva-Ramos only obtained that documentary evidence after proceedings before the Immigration Judge were finished. The documents were finally obtained through a FOIA request and not made available until after the April suppression hearing and his initial appeal to the BIA.[18]　Those

---

[16] In addition, Oliva-Ramos also sought to present additional evidence relating to the translator's interpretation of the word "arma" discussed above.

[17] In denying his FOIA request, the Government explained:

> FOIA Exemption 2(high) protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

ICE Response to Oliva-Ramos's FOIA request, definition of FOIA Exemption 2 (high) (Feb. 19, 2008)). The Government further explained that "FOIA Exemption 7(E) protects records compiled for law enforcement purposes, the release of which could disclose techniques and/or procedures for law enforcement investigations or prosecutions, or could reasonably be expected to risk circumventions of the law." *Id.* (citing ICE Response to FOIA Request, definition of FOIA Exemption 7(E) (Feb. 19, 2008)).

documents were attached as an exhibit to the motion to remand. The motion included ICE memoranda regarding the Fugitive Operations Teams and ICE statistics on arrests.

The ICE memorandum dated September 29, 2006 changed the agency's policy with respect to achieving an arrest target of 1,000 "fugitive aliens" per Fugitive Operations Team ("FOT") as previously established in an ICE memorandum dated January 31, 2006. The January memorandum had specified that "collateral arrests" would not be counted toward the goal of 1,000 arrests. The September memorandum changed the policy to permit up to fifty percent of each team's arrest goal to be satisfied by counting "collateral arrests." These are arrests of persons who were not themselves the targets of the FOT and had not missed removal hearings or departure deadlines, but were discovered during ICE operations. In the following fiscal year, when Oliva-Ramos was detained by a FOT that was after someone else, collateral arrests comprised forty percent of the total number of ICE arrests by FOTs. Collateral arrests accounted for nearly twenty-five percent of all FOTs arrests in fiscal year 2007. Oliva-Ramos argued that he was detained pursuant to this policy, and that the policy both encouraged and resulted in widespread violations of the Fourth Amendment.

However, the Board reasoned that remand was unwarranted because the BIA was not bound by the *Lopez-Mendoza* plurality opinion. As noted above, in *Lopez-Mendoza*, the Court had recognized the possibility of the exclusionary rule applying to civil deportation proceedings based on widespread or egregious violations of the Fourth Amendment.

Thus, the BIA dismissed the appeal, denied Oliva-Ramos's motion to remand, and this petition for review followed.

**II. Standard of Review**

---

[18] He obtained the documents after the evidence was released to the public as a result of FOIA litigation by a professor at the Benjamin N. Cardozo School of Law.

The BIA issued its own opinion. We therefore review its decision rather than that of the IJ. *Li v. Att'y. Gen.*, 400 F.3d 157, 162 (3d Cir. 2005). Where the "BIA's opinion directly states that the BIA is deferring to the IJ, or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions," we review both the BIA and IJ decisions. *Voci v. Gonzales*, 409 F.3d 607, 613 (3d Cir. 2005).

We review the BIA's denial of a motion to reopen for abuse of discretion. *Luntungan v. Att'y Gen.*, 449 F.3d 551, 555 (3d Cir. 2006). "Under the abuse of discretion standard, the Board's decision must be reversed if it is arbitrary, irrational, or contrary to law." *Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002) (internal quotation marks omitted). We review the BIA's conclusions of law such as "whether the BIA applied the correct legal standard in considering the motion to reopen" and the underlying constitutional claims *de novo*. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 153-54 (3d Cir. 2007).

## III. Discussion

We begin our analysis with a discussion of *INS v. Lopez-Mendoza*, as that case is central to our disposition of these petitions. We then proceed to consider, in turn, Oliva-Ramos's due process claims, Fourth Amendment claims, and claims predicated on various regulatory violations.

### A. *Lopez-Mendoza*

In *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), the Supreme Court held that the exclusionary rule generally does not apply to removal proceedings. The Court reached that conclusion after balancing the deterrent effect of the exclusionary rule against the social cost of extending its application to civil removal proceedings. However, a plurality of the Justices was careful to add the following qualifier to their discussion of that balancing:

> Our conclusions concerning the exclusionary rule's value might change, if there developed

18

good reason to believe that Fourth Amendment violations by INS officers were widespread. Finally, we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained. At issue here is the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers. We hold that evidence derived from such arrests need not be suppressed in an INS civil deportation hearing.

*Lopez-Mendoza*, 468 U.S. at 1050-51 (footnote omitted) (internal citations omitted).

In *Lopez-Mendoza*, two citizens of Mexico were ordered deported after separate immigration proceedings. INS agents arrested Lopez-Mendoza at his job without a warrant to search the jobsite or a warrant to arrest anyone there. After the shop owner refused to permit the agents to speak with his employees during work hours, they devised a scheme to distract the shop owner so that they could question his employees. While he was being questioned, Lopez-Mendoza told the agents that he was a citizen of Mexico, and that he had entered the United States without inspection by immigration authorities.

In the proceedings that followed, Lopez-Mendoza argued that statements he made pursuant to his warrantless arrest should not have been admitted in his deportation proceedings. The Court reasoned that officers who violated an arrestee's rights were already subject to civil liability, and that in civil deportation proceedings the exclusionary rule "'is unlikely to provide significant, much less substantial, additional deterrence.'" *Id.* at 1046 (quoting *United States v. Janis*, 428 U.S. 433, 458 (1976)).

Nevertheless, as we quoted above, a plurality of the Court allowed for the possibility of suppression in the case of

19

widespread or egregious violations of constitutional rights.[19] Four Justices dissented. Each dissenting Justice believed that the exclusionary rule should generally apply in deportation proceedings. Justice White disagreed with the result of the majority's balancing of the costs and benefits of applying the exclusionary rule in removal proceedings. He would have applied the rule without the limitation imposed by the majority decision. *See* 468 U.S. at 1052 (White, J., dissenting) ("I believe that the conclusion of the majority is based upon an incorrect assessment of the costs and benefits of applying the rule in [civil removal proceedings]."). Justice Brennan agreed, stating that "I fully agree with Justice White that . . . the exclusionary rule must apply in civil deportation proceedings" not because it is a deterrent but because "of the Fourth Amendment itself." *Id.* at 1051 (Brennan, J., dissenting). Justice Marshall also "agree[d] with Justice White that . . . [precedent] compels the conclusion that the exclusionary rule should apply in civil deportation proceedings." *Id.* at 1060 (Marshall, J., dissenting). And, finally, Justice Stevens joined all of Justice White's dissent except for the latter's conclusion that the good faith exception to the exclusionary rule should apply with equal force to warrantless immigration searches because the Court had yet to conclude that the good faith exception applied to warrantless searches generally. *Id.* at 1061 (Stevens, J., dissenting). Thus, though technically correct to characterize the portion of the majority opinion recognizing a potential exception to the Court's holding as a "plurality opinion," eight Justices agreed that the exclusionary rule should apply in deportation/removal proceedings involving egregious or widespread Fourth Amendment violations. Thus, where an alien can establish either of those two circumstances, the plurality opinion can only be read as affirming that the remedy of suppression justifies the social cost.[20]

---

[19] While Chief Justice Rehnquist joined the portion of the opinion holding that the exclusionary rule generally did not apply in deportation proceedings, he did not join in the part of the opinion recognizing that egregious or widespread Fourth Amendment violations might warrant application of the exclusionary rule.

[20] This is not surprising since, as Justice Brennan had explained, lawless disregard by police for the privacy

Thus, *Lopez-Mendoza* sanctions the application of the exclusionary rule in cases where constitutional violations by immigration officers are "widespread" or evidence has been obtained as a result of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Lopez-Mendoza*, 468 U.S. at 1050-51. With this rule in mind, we proceed to consider Oliva-Ramos's claims.

### B. Due Process Claims

We first consider Oliva-Ramos's claims that the IJ violated his right to due process by failing to rule on his pending motions to subpoena witnesses and documents and by declining to correct translation errors. Oliva-Ramos also claims that the BIA denied him due process by declining to remand his case to the IJ to consider newly available evidence of egregious and/or widespread abuses.

We are, of course, aware of the very valid concern expressed in *Lopez-Mendoza* that "a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country. . . ." *Id.* at 1039. Nevertheless, removal proceedings must comport with basic notions of due process. *Kamara v. Att'y Gen.*, 420 F.3d 202, 211 (3d Cir. 2005). Accordingly, concerns for brevity, efficiency and expedience must not be used to justify denying an alien the right to produce witnesses where that request is appropriate and the witnesses' presence appears necessary to satisfy basic notions of due process. That is particularly true where the IJ's refusal to issue or enforce subpoenas is contrary to the very regulatory scheme governing the removal process.

---

interests protected by the Fourth Amendment creates significant social costs that cannot be ignored. *See Stone v. Powell*, 428 U.S. 465, 524 (1976) (Brennan, J., dissenting) ("To sanction disrespect and disregard for the Constitution in the name of protecting society from law-breakers is to make the government itself lawless and to subvert those values upon which our ultimate freedom and liberty depend.") (footnote omitted).

Here, the IJ's refusal to grant the subpoenas is contrary to 8 C.F.R. § 1003.35(b). Under that regulation, "[a]n Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien." *Id*. at § 1003.35(b)(1). When a party applies for a subpoena, the movant must "state in writing or at the proceeding . . . what he or she expects to prove by such witnesses or documentary evidence, and . . . show affirmatively that he or she has made diligent effort, without success to produce the same." *Id.* at § 1003.35(b)(2). Although the regulation provides some discretion to an IJ, "[u]pon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence is essential, the Immigration Judge *shall* issue a subpoena." *Id*. at § 1003.35(b)(3) (emphasis added). Given the circumstances here, we believe that the IJ abused her discretion in determining that the witnesses and documents were not essential. *Cf. Cuadras v. INS*, 910 F.2d 572, 573 (9th Cir. 1990) ("[T]he IJ is not required to issue the subpoena unless she is satisfied that the evidence is 'essential.' 8 C.F.R. 287.4(a)(2)(ii)(C). Since the IJ did not rely on the BHRHA report, he did not abuse his discretion in determining that the witnesses and documents were not essential.").

As we explained above, during the removal proceedings before the IJ, Oliva-Ramos moved to subpoena documents related to the search and seizure of his home and arrest, documents relevant to the underlying policy for conducting such searches and seizures, including training manuals and documentation of ICE Fugitive Operation Task Force policy and procedures, and records related to the ICE officers who arrested him. He also attempted to subpoena the other ICE officers who participated in his arrest.

Oliva-Ramos satisfied both requirements of the regulation. The requested witnesses and documents were essential to Oliva-Ramos's claim of egregious or widespread violations and alleged constitutional violations by the Government. ICE policy and practice manuals on search and seizure practices and its practices with respect to consent and entry of dwellings could have shed light on the contested nature of Clara Oliva's consent, as well as whether Oliva-

22

Ramos was improperly seized. In addition, the testimony of additional officers who were present during the investigation and arrest of Oliva-Ramos could have been used to impeach the testimony of the Government's sole witness during the suppression hearing or to adduce additional facts that may have altered the analysis of alleged constitutional violations, including the nature of Clara's alleged consent. Not allowing Oliva-Ramos to introduce this testimony is particularly problematic here because the only witness who testified for the Government could not recall Oliva-Ramos's seizure or any facts related to it. Since the Government forced Oliva Ramos to litigate his FOIA request, it should have been clear to the IJ that, even though Oliva-Ramos had exercised diligence, he was not able to effectively present his case and that he was not attempting to delay or obfuscate the proceedings.

We recognize that "[o]ne who raises the claim questioning the legality of the evidence must come forward with proof establishing a prima facie case before the Service will be called on to assume the burden of justifying the manner in which it obtained the evidence." *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (1988). Oliva-Ramos attempted to meet his burden, but was thwarted by his inability to obtain the evidence and witnesses necessary to do so. Only after the briefing before the BIA did the Government turn over the documents that Oliva-Ramos had tried to subpoena.

As noted above, the Government had previously resisted that subpoena, and Oliva-Ramos appeared before the IJ without the benefit of those documents or the witnesses he had tried to subpoena. He was finally able to obtain the documentary evidence only after members of a clinical program at the Cardozo School of Law initiated FOIA litigation. The documents thus obtained were attached to his motion to reopen and were clearly relevant to his burden of establishing whether any abuses were widespread and/or egregious. Rather than tender a timely disclosure of such documents pursuant to the subpoena, the Government forced Oliva-Ramos to rely on a FOIA request to obtain documents that were in the exclusive custody and control of the Government and were clearly germane to his legal claims.

We do not suggest that the documents would have satisfied Oliva-Ramos's burden had the IJ or BIA reviewed them. We only note that the documents certainly appeared relevant to Oliva-Ramos's legal claims, and there is nothing to suggest that they were sought in bad faith or to delay the proceedings.

Because the Immigration Judge never ruled on Oliva-Ramos's motion to subpoena witnesses and documents, the BIA had no underlying order to review. Thus, we will grant Oliva-Ramos's motion to reopen the proceedings in order to permit him to subpoena the additional witnesses and to introduce newly available documents, and will instruct the BIA to remand to the Immigration Judge in the event that additional evidentiary proceedings are appropriate.

We will, however, affirm the BIA's ruling that errors in the transcript and related questioning did not deny Oliva-Ramos the due process of law. Any such errors were clarified and the record demonstrates that Olivia-Ramos fully understood the questions asked of him during his interview with Officer Belluardo.

Inasmuch as we conclude the BIA abused its discretion in denying Oliva-Ramos's motion to reopen, we need not reach Oliva-Ramos's additional due process claims based on the conduct of the removal hearings.

### C. The Exclusionary Rule

We now address the heart of Oliva-Ramos's petition. Oliva-Ramos argues that the BIA misapplied Fourth Amendment law when evaluating his various Fourth Amendment claims. He claimed that the ICE agents failed to obtain proper consent to enter the apartment, that they arrested him without a warrant and without probable cause, and that they seized him without reasonable suspicion. Relying on *Lopez-Mendoza*, Oliva-Ramos contends that Fourth Amendment law provides for the suppression of evidence obtained as a result of these violations because they were egregious and/or widespread. According to Oliva-Ramos, the BIA erred in categorically rejecting all of Oliva-

24

Ramos's Fourth Amendment arguments on the ground that the exclusionary rule does not apply in deportation proceedings, and thereby erred in failing to evaluate, first, whether ICE agents violated Oliva-Ramos's Fourth Amendment rights, and, second, whether those violations were egregious or widespread. We agree.

The BIA rejected Oliva-Ramos's reliance on *Lopez-Mendoza* because it regarded the "comments from a plurality of the Supreme Court [to be] obiter dictum." The BIA explained that the Court had not yet found circumstances sufficient to apply the exclusionary rule in removal proceedings, and the Board's "own precedents . . . recognize no such exception to the inapplicability of the exclusionary rule premised on widespread Fourth Amendment violations." There are several flaws in the BIA's approach.

The BIA leapfrogged over the serious concerns it should have addressed under *Lopez-Mendoza* about the manner in which the evidence was obtained here. *See Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234-35 (2d Cir. 2006); *United States v. Navarro-Diaz*, 420 F.3d 581, 587 (6th Cir. 2005); *Orhorhaghe v. INS*, 38 F.3d 488, 493 (9th Cir. 1994); *cf. United States v. Stabile*, 633 F.3d 219, 243 (3d Cir. 2011) ("Typically, the exclusionary rule requires that we suppress evidence obtained as a result of an illegal search.").

We must reject the BIA's reading of *Lopez-Mendoza* that would only permit suppression of evidence based on "fundamentally unfair" circumstances in violation of the due process clause of the Fifth Amendment. The BIA's analysis of *Lopez-Mendoza* views that opinion only as a plurality. In doing so, the BIA ignored the fact that almost all of the Justices on the Court agreed that the exclusionary rule should apply to some extent in removal hearings. As we explained above, eight of the nine Justices agreed with that proposition. Four would have limited the rule to instances of widespread or egregious violations of law by Government officials, and four others would apply the rule without that condition. *See Puc-Ruiz v. Holder*, 629 F.3d 771, 778 n.2 (8th Cir. 2010) (citing *Lopez-Mendoza*, 468 U.S. at 1051-61 (Brennan, White, Marshall, and Stevens, JJ., dissenting)); *see also Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448 n.2 (9th Cir.

1994) (same).

Moreover, even if the pronouncement in *Lopez-Mendoza* was dicta as the BIA labeled it, Supreme Court dicta should not be so cavalierly cast aside. *See Official Committee of Unsecured Creditors v. Chinery,* 330 F.3d 548, 561 (3d Cir. 2003) ( "[W]e should not idly ignore considered statements the Supreme Court makes in dicta"); *see also Wroblewska v. Holder*, 656 F.3d 473, 478 (7th Cir. 2011) ("The Supreme Court has required a showing of 'egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness' before the exclusionary rule will apply in immigration proceedings. *Lopez-Mendoza*, 468 U.S. at 1050-51. It makes no difference that Wroblewska's argument is styled as a due-process argument rather than one based on the Fourth Amendment."). "Accordingly, it is reasonable to read *Lopez-Mendoza* as showing that eight Justices would have applied the exclusionary rule in circumstances where evidence was obtained through an 'egregious' Fourth Amendment violation." *Puc-Ruiz*, 629 F.3d at 778 n.2. The fact that the Court has not yet applied the rule in a deportation proceeding cannot undermine the fact that the Court has allowed for that possibility. The fact that the BIA believed its own precedents did not recognize the exception set out in *Lopez-Mendoza* can neither negate nor minimize the fact that the exception has been recognized by the Supreme Court.

Accordingly, we reiterate today that the exclusionary rule may apply in removal proceedings where an alien shows "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Lopez-Mendoza*, 468 U.S. at 1051; *see also United States v. Bowley*, 435 F.3d 426, 430 (3d Cir. 2006) ("The Court in *Lopez-Mendoza* was careful to qualify its broad statement by noting that it was not considering 'egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained.'").

The BIA therefore erred in concluding that the discussion in *Lopez-Mendoza* lacked the force of law, and the

Board clearly failed to conduct the proper analysis to determine whether any such egregious violations occurred. The IJ and the Board should have, but did not, first determine whether agents violated Oliva-Ramos's Fourth Amendment rights and second, whether any such violations implicated the *Lopez-Mendoza* exception for being widespread or egregious. We will briefly note the possible merits of each prong of this argument against the circumstances here.

### 1. Egregious Violations of the Fourth Amendment

We have not had occasion to consider when conduct by ICE officials (or anyone acting in a similar role) would constitute the kind of egregious violations that could trigger the protections endemic in the exclusionary rule and justify applying the rule in the civil arena. We now take this opportunity to more precisely define the standard that should be used in determining whether unlawful conduct by governmental officers rises to the level of an "egregious" violation of the Fourth Amendment.

In *Lopez-Mendoza*, the Supreme Court cited *Rochin v. California*, 342 U.S. 165 (1952), as an example of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Lopez-Mendoza*, 468 U.S. at 1050-51. In *Rochin*, three deputy sheriffs forcibly entered a home and saw Rochin swallow some capsules which were believed to be a controlled substance. In order to recover that evidence, Rochin was taken to a hospital where a doctor induced vomiting at the direction of one of the officers by inserting a tube into Rochin's stomach and pumping a chemical into him. The Supreme Court found that such conduct offended even "hardened sensibilities." *Rochin*, 342 U.S. at 172. It "shock[ed] the conscience" and violated Rochin's right to due process under the Constitution. *Id.*

*Rochin* was decided before the Fourth Amendment was applied to the states through incorporation by the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643 (1961). "Consequently, the Court has not relied on the *Rochin* 'shocks the conscience' standard but has instead applied a Fourth Amendment reasonableness analysis in cases that, like *Rochin*, involved highly intrusive searches or

seizures." *Lester v. City of Chicago*, 830 F.2d 706, 711 (7th Cir. 1987). Moreover, the Supreme Court has rejected the use of the Fourteenth Amendment's "shocks the conscience" standard in Section 1983 claims involving excessive force under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "Because different standards attach to the various rights, identifying the proper constitutional approach is essential." *Gottlieb ex rel. Calabria v. Laurel Highlands School Dist.*, 272 F.3d 168, 171 (3d Cir. 2001). Thus, "the difference between reviewing [the Government's] actions under the reasonableness standard of the Fourth Amendment or the shocks the conscience standard of the Fourteenth Amendment may be determinative." *Id.*

The jurisprudence that has developed for "ordinary" Fourth Amendment violations—where the test is "reasonableness"—is critical to determining whether Fourth Amendment violations occurred in the first instance. However, a violation must be more than "unreasonable" for it to satisfy the higher threshold of an "egregious" Fourth Amendment violation under *Lopez-Mendoza*. *See Gonzalez-Rivera v. INS*, 22 F.3d at 1448 ("We cannot determine whether the IJ properly excluded the I-213 Form based solely on our conclusion that the officers' conduct was unreasonable."); *Puc-Ruiz*, 629 F.3d at 778 ("*Lopez-Mendoza* requires more than a violation to justify exclusion."). The gap between reasonableness and egregious violations has led to our sister courts of appeals employing varying approaches to determining whether a Fourth Amendment violation is egregious. We consider some of those approaches here.

The Court of Appeals for the Ninth Circuit has adopted a test resembling the qualified immunity inquiry into whether a constitutional violation was the result of bad faith. *Orhorhaghe*, 38 F.3d at 493. After establishing that a Fourth Amendment violation has occurred, the Ninth Circuit considers "whether the agents committed the violations deliberately or by conduct a reasonable officer should have known would violate the Constitution." *Id.* The test was developed in *Adamson v. C.I.R.*, 745 F.2d 541, 545 (9th Cir. 1984), after analyzing the *Janis* decision, 428 U.S. 433 (1976), that the Supreme Court relied on for the weighing of interests analysis in *Lopez-Mendoza*. The *Adamson* court

28

determined from "language in *Lopez-Mendoza* that deterrence is not the only consideration" underlying the exclusionary rule. 745 F.2d at 545. "[I]n addition to deterrence, the exclusionary rule serves the vital function of preserving judicial integrity." *Id.* The Ninth Circuit concluded that if "police unreasonably violated the defendant's fourth amendment rights, the integrity of the courts would be implicated." *Id.* at 546.

Oliva-Ramos's petition, however, demonstrates the difficulty courts and agencies face in adopting a test that is perched on the fulcrum of the good faith of the police. Oliva-Ramos has alleged that it was ICE's policy to detain individuals without reasonable suspicion and to enter homes during pre-dawn raids without consent. He also alleges that the officers who carry out these pre-dawn raids are acting under the guidance of ICE policy. Thus, focusing only on their good faith would permit conduct that may be objectively reasonable based on directives of the Department of Homeland Security, but nevertheless result in routine invasions of the constitutionally protected privacy rights of individuals.[21]

In *Almeida-Amaral v. Gonzales*, 461 F.3d 231 (2d Cir. 2006), the Court of Appeals for the Second Circuit also addressed this issue. There, Almeida-Amaral, who was 17 years old, walked into a parking lot that was adjacent to a gas station in southern Texas. He was approached by a uniformed border patrol agent who stopped him and asked for identification. Almeida-Amaral was arrested when he produced a Brazilian passport and made subsequent

---

[21] This analysis must, by its very nature, differ from an inquiry into an officer's good faith that allows evidence to be used at a trial even though it was seized by an overly broad warrant if the Government can establish the good faith of the officers who relied on the defective warrant. *See Mass. v. Sheppard*, 468 U.S. 981, 985-87 (1984); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 151 (3d Cir. 2002). The egregious inquiry under *Lopez-Mendoza* cannot be sanitized by the underlying agency policy even if the good faith of the immigration officer is established.

statements that formed the basis of an I-213 Form and an order of deportation. When removal proceedings were instituted against him, Almeida-Amaral argued that his passport and statements to the police should not be considered because they were obtained upon a warrantless seizure and arrest in violation of the Fourth Amendment.[22]

The Court of Appeals for the Second Circuit began its discussion by explicitly adopting the *Lopez-Mendoza* exception applying the exclusionary rule in civil removal proceedings. *See id.* at 234 ("[W]e now apply it as the law of the circuit."). It then held that "exclusion of evidence is appropriate under the rule of *Lopez-Mendoza* if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its egregiousness or unfairness—undermined the reliability of the evidence in dispute." *Id.* at 235. We accept the test adopted by the Second Circuit with slight modification.

The Second Circuit made clear that the probative value of the evidence obtained is irrelevant to the inquiry. We agree that the probative value of the evidence obtained cannot be part of the calculus. In *Rochin*, the capsules that were forcibly removed from the defendant's stomach were highly probative and extraordinarily reliable evidence that he had consumed a controlled substance. Yet, the Supreme Court had no problem holding that the evidence must be suppressed because of the tactics the police used to extract it. *See Gonzalez-Rivera*, 22 F.3d at 1451. "Indeed, *Rochin* stated in no uncertain terms that reliability cannot be the sole touchstone of the Fourth Amendment." *Almeida-Amaral*, 461 F.3d at 235 (citing *Rochin*, 342 U.S. at 173). However, we think it is circular to refer to an "egregious violation that was fundamentally unfair," or one that undermines the reliability or the probative value of the evidence "regardless of its egregiousness or unfairness," because the inquiry must determine whether an egregious violation has occurred. We therefore conclude that evidence will be the result of an

---

[22] He also argued that since he was an unaccompanied minor, his statement was obtained in violation of applicable regulations. The court did not focus on that claim.

egregious violation within the meaning of *Lopez-Mendoza*, if the record evidence established either (a) that a constitutional violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its unfairness—undermined the reliability of the evidence in dispute. With that alteration, we adopt the reasoning of the Court of Appeals for the Second Circuit. *See id.* at 235.

The Second Circuit did not discuss further the contours of the second prong of its approach—"that the violation-regardless of its egregiousness or unfairness-undermined the reliability of the evidence in dispute"—because the facts of the case did not raise "doubts about the veracity of the evidence obtained as a result of the seizure." *Id.* at 235. Rather, the court focused on when a Fourth Amendment violation may be "fundamentally unfair." First, the court emphasized that whether a violation is fundamentally unfair depends heavily upon the facts of each case.[23] In Almeida-Amaral's case, the court found that "two principles . . . bear on whether petitioner suffered an egregious violation of his constitutional rights." *Id.* The court explained:

> First, the egregiousness of a constitutional violation cannot be gauged solely on the basis of the validity (or invalidity) of the stop, but must also be based on the characteristics and severity of the offending conduct. Thus, if an individual is subjected to a seizure for *no* reason at all, that by itself may constitute an egregious violation, but only if the seizure is sufficiently severe. Second, even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration).

---

[23] The court explained in a footnote that "we do not intend to give an exhaustive list of what might constitute an egregious violation of an individual's rights. We emphasize these principles only because they are especially germane to the facts and circumstances of the case before us." *Almeida-Amaral*, 461 F.3d at 235 n.1.

*Id*. It added that "exclusion may well be proper where the seizure itself is gross or unreasonable in addition to being without a plausible legal ground, *e.g.*, when the initial illegal stop is particularly lengthy, there is a show or use of force, etc." *Id.* at 236. And second, where "there is evidence that the stop was based on race, the violation would be egregious, and the exclusionary rule would apply." *Id.* at 237.

We discern a few guiding principles from *Almeida-Amaral*. First, and most importantly, courts and agencies must adopt a flexible case-by-case approach for evaluating egregiousness, based on a general set of background principles which fulfill the two-part *Lopez-Mendoza* test. *See id*. at 235 n.1 ("[W]e do not intend to give an exhaustive list of what might constitute an egregious violation of an individual's rights."). Second, those evaluating the egregiousness of the violation should pay close attention to the "characteristics and severity of the offending conduct." *Id*. at 235. As the Court of Appeals for the First Circuit noted, "evidence of any government misconduct by threats, coercion or physical abuse" might be important considerations in evaluating egregiousness. *Kandamar v. Gonzales*, 464 F.3d 65, 71 (1st Cir. 2006). And the Court of Appeals for the Eighth Circuit found evidence of "physical brutality" and an "unreasonable show or use of force" relevant to the egregiousness inquiry. *Puc-Ruiz*, 629 F.3d at 778-79. In rejecting the petitioner's egregiousness claim, that court also noted it was not dealing with "a case in which police officers invaded private property and detained individuals with *no* articulable suspicion whatsoever." *Id*. at 779 (emphasis in original).

These cases demonstrate that there is no one-size-fits-all approach to determining whether a Fourth Amendment violation is egregious. Indeed, the exceptions announced in *Lopez-Mendoza* do not suggest or imply that any strict test-based approach is appropriate or warranted. Using this formulation of the rule as its guide, on remand, the BIA's inquiry should include such factors as: whether Oliva-Ramos can establish intentional violations of the Fourth Amendment, whether the seizure itself was so gross or unreasonable in addition to being without a plausible legal ground, (e.g., when the initial illegal stop is particularly lengthy, there is an

unnecessary and menacing show or use of force, etc.), whether improper seizures, illegal entry of homes, or arrests occurred under threats, coercion or physical abuse, the extent to which the agents reported to unreasonable shows of force, and finally, whether any seizures or arrests were based on race or perceived ethnicity. These factors are illustrative of the inquiry and not intended as an exhaustive list of factors that should always be considered, nor is any one factor necessarily determinative of the outcome in every case. Rather, the familiar totality of the circumstances must guide the inquiry and determine its outcome. Thus, on remand, the BIA (and perhaps the IJ) must meaningfully examine the particular facts and circumstances of the ICE agents' conduct. To the extent that the factors discussed above are relevant, they should consider them.[24] However, the analysis should not be limited to these factors, and Oliva-Ramos is free on remand to emphasize any particular characteristics of Clara's alleged consent, and his seizure and arrest that he believes renders the ICE agents' conduct egregious. In turn, the BIA (and perhaps, the IJ) must consider both whether the ICE agents violated Oliva-Ramos's Fourth Amendment rights and whether those violations were egregious.

### 2. Widespread Violations of the Fourth Amendment

To our knowledge, no court has explicitly adopted or applied the portion of the *Lopez-Mendoza* pronouncement that "conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread." 468 U.S. at 1050. Yet it is as much a part of the *Lopez-Mendoza* discussion as "egregious" violations, and we cannot ignore it simply because we are forced to write on the proverbial "blank slate." Rather, determining when widespread violations of the Fourth Amendment may serve as an independent rationale for applying the exclusionary rule in

---

[24] However, it is important to note—as explained above—the inquiry does not turn on the good/bad faith of the agents involved. Rather, this is but one of many circumstances that may be relevant in a particular case.

33

civil removal proceedings is simply a matter of first impression for us.[25] Given the discussion in *Lopez-Mendoza*, we think that most constitutional violations that are part of a pattern of widespread violations of the Fourth Amendment would also satisfy the test for an egregious violation, as discussed above.

On other occasions, in a concurring opinion, Justice Kennedy has acknowledged that evidence of widespread Fourth Amendment violations would raise serious concerns. In his concurring opinion in *Hudson v. Michigan*, 547 U.S. 586 (2006), Justice Kennedy explained:

> Today's decision does not address any demonstrated pattern of knock-and-announce violations. If a widespread pattern of violations

---

[25] Allegations of widespread violations of the Fourth Amendment have been presented previously before this Court in a different context. *See Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60 (3d Cir. 2011). There, the plaintiffs brought a *Bivens* action (allowing for damages remedies for constitutional violations by federal agents) against various federal and local immigration officials, as well as officers who actually participated in raids that led to the plaintiffs' arrest. The plaintiffs alleged that Operation Return to Sender was being conducted by inadequately trained officers who relied on an '"outdated and inaccurate [database] in up to 50% of cases,"' *id*. at 64, and who engaged in a '"practice' of unlawful and abusive raids [that] flourished as a predictable consequence of the 'arbitrary' and 'exponentially-increased quotas'" that drove the programmatic abuses. *Id*. The plaintiffs further alleged that the predictable "collateral arrests" of persons not targeted by the raids were allowed to count toward the inflated quotas of arrests that officers were expected to meet and that this resulted in a pattern of constitutional abuses that continued once the officers "actually entered the home." *Id*. at 64-65. We did not address the merits of the alleged constitutional torts because the only issues before us involved the defendants' qualified immunity.

34

were shown, and particularly if those violations were committed against persons who lacked the means or voice to mount an effective protest, there would be reason for grave concern. Even then, however, the Court would have to acknowledge that extending the remedy of exclusion to all the evidence seized following a knock-and-announce violation would mean revising the requirement of causation that limits our discretion in applying the exclusionary rule.

*Id*. at 604 (Kennedy, J., concurring).

Similarly, in *United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005), the court expressed the following view:

The Supreme Court's language in *Lopez-Mendoza*—that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest"—when taken out of context, could be read to suggest that random, widespread detentions and questioning of suspected aliens would not implicate Fourth Amendment rights. 468 U.S. at 1039, 104 S. Ct. 3479. We do not believe, however, that *Lopez-Mendoza* sanctions such a result. The Supreme Court qualified its holding when it stated in the last paragraph of *Lopez-Mendoza* that "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness."

*Navarro-Diaz*, 420 F.3d at 587.

Oliva-Ramos alleges that the ICE officers' conduct here is both egregious and widespread. If true, the allegations here may well illustrate the precise situation that was anticipated in *Lopez-Mendoza*. Clearly, a single Fourth Amendment violation is not sufficient to extend the exclusionary rule to civil removal proceedings unless it is also egregious. Not every illegal entry into a home will rise to that

35

level. But Oliva-Ramos has alleged much more than the forcible warrantless entry into a single home.

It is uncontested that Oliva-Ramos was taken into custody during the course of a pre-dawn raid. Such raids of homes have traditionally been viewed with particular opprobrium unless the timing is justified by the particular circumstances. *See* Fed. R. Crim. P. 41(e)(2)(A) ("The warrant must command the officer to: (ii) execute the warrant during daytime [defined as "the hours between 6:00 a.m. and 10:00 p.m. . . . ," Fed R. Crim. P. 41(a)(2)(B)], unless the judge for good cause expressly authorizes execution at another time . . . ;" *see also United States ex rel. Boyance v. Myers*, 398 F.2d 896, 897 (3d Cir. 1968) ("The time of a police search of an occupied family home may be a significant factor in determining whether, in a Fourth Amendment sense, the search is 'unreasonable.'").

Oliva-Ramos has attempted to introduce evidence of a consistent pattern of conducting these raids during unreasonable hours, such as the 4:30 a.m. raid that occurred here. Oliva-Ramos is trying to support these allegations by resorting to documents that were not available when he had his hearing before the IJ, but were presented to the BIA for its consideration on appeal. This evidence included ICE Memoranda regarding the Fugitive Operations Teams and ICE arrest statistics. It appears from this record the documents were not available for the IJ to consider initially because they were produced only after Oliva-Ramos litigated their disclosure under the Freedom of Information Act. In his FOIA request dated October 4, 2007, Oliva-Ramos requested "ICE policies, directives, and memoranda regarding collateral arrests made at the suspected locations of individuals targeted by ICE." *Id.* The Government refused to release these documents, citing FOIA exemptions. *Id.* As Oliva-Ramos notes, the Government's withholding of these documents impeded Oliva-Ramos's ability to present evidence before the IJ in the first instance prior to his April 23, 2008 suppression hearing.

Oliva-Ramos argues that ICE conceded that it has a policy of rounding up everyone in a home, without any particularized suspicion, in order to question all of the

occupants about their immigration status.[26]  The BIA's refusal to even consider that evidence was contrary to *Lopez-Mendoza*.  By turning a blind eye to that evidence, the BIA prevented Oliva-Ramos from potentially demonstrating that the circumstances of his seizure fit within the narrow exception left open in *Lopez-Mendoza*.[27]

---

[26]  In *Argueta*, the petitioners alleged that the unconstitutional pre-dawn raids continued "until the agents' van was filled." 643 F.3d at 65.

[27] The Government acknowledges that Oliva-Ramos was detained as the result of "Operation Return to Sender."  In May 2006, the Government launched this nationwide program to capture fugitive aliens using dragnet-like home and office raids.  *Argueta*, 643 F.3d at 63-67.  In a 2009 report prepared under the guidance of an advisory panel of law enforcement professionals, a Cardozo law school clinic issued a public study purporting to document "a suspiciously uniform pattern of constitutional violations during ICE [Immigration and Customs Enforcement] home raids.  Bess Chiu et al., Cardozo Immigration Justice Clinic, Constitution on ICE: A Report on Immigration Home Raid Operations 9 (2009). *Available at* http://www.cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/immigrationlaw-741/IJC_ICE-Home-Raid-Report%20Updated.pdf.  The report attempted to detail "[t]actical pre-dawn or nighttime home entries, conducted by heavily armed seven member teams, with residents who often do not speak English . . . ." *Id*. at 29. Individuals purportedly involved in one such raid alleged routine constitutional violations by government officials, which led one commentator to state:  "While any law enforcement entry into the home is likely to seem threatening to residents, the accounts of ICE enforcement operations indicate that the agency uses excessive displays of force. . . . Evidence now abounds that officers frequently enter without consent—that they threaten or intimidate residents, make misrepresentations of authority, push their way through open doors, or simply enter without waiting to speak to a resident at all.  With no valid warrants, no exigent circumstances, and often no valid consent, one major plank of ICE's interior enforcement efforts depends on routine violations of a core constitutional

In attempting to supplement the record and have the BIA remand to the IJ for additional proceedings where the newly obtained records could be considered, Oliva-Ramos is merely asking for an opportunity to present evidence that the raid leading to his apprehension falls within the narrow exception recognized in *Lopez-Mendoza*, and that it was therefore error to categorically refuse the remedy of suppression without affording him an opportunity to establish that the Government was engaging in the kind of egregious or widespread abuses that justifies suppression under *Lopez-Mendoza*. We do not suggest that these allegations are established fact, nor that they would necessarily satisfy Oliva-Ramos's burden under *Lopez-Mendoza* even if proven. That is for the IJ and BIA to determine in the first instance. However, these allegations are woven into the fabric of the central issue before us, and cannot properly be resolved absent the materials Oliva-Ramos sought to present in the removal proceedings.

We believe the BIA erred in not allowing Oliva-Ramos an opportunity to support his Fourth Amendment claim. We take no position, however, on the underlying question of whether the circumstances here are so egregious or widespread as to justify a suppression order. We merely conclude that Oliva-Ramos must be permitted to present evidence to support his contention that the Government's conduct here falls within the exception the Supreme Court was careful to allow in *Lopez-Mendoza*.

### D. Regulatory Violations

### 1. 8 C.F.R. § 287.8(f)(2) (consent to enter)

As we summarized above, the IJ and BIA dismissed Oliva-Ramos's claims because they concluded that Clara consented to entry and that Oliva-Ramos could not, therefore, establish any Fourth Amendment violation. However, we

---

guarantee." Nathan Treadwell, *Fugitive Operations & the Fourth Amendment: Representing Immigrants Arrested in Warrantless Home Raids*, 89 N.C. L. Rev. 507, 516-18 (2011) (footnotes omitted).

agree that the BIA failed to apply the proper Fourth Amendment inquiry.

The BIA considered the question in the context of 8 C.F.R. § 287.8(f)(2) which provides:

> An immigration officer may not enter into the non-public areas of a business, a residence including the curtilage of such residence, or a farm or other outdoor agricultural operation, except as provided in section 287(a)(3) of the Act, for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given. If the immigration officer is denied access to conduct a site inspection, a warrant may be obtained.

In affirming the IJ's decision that no Fourth Amendment violation occurred because the entry was consensual, the BIA stated that "we have considered the respondent's asserted bases for contending that the consent to the officers' entry was coerced (or otherwise invalid) but we are not persuaded by them." "Although the BIA 'is not required to 'write an exegesis' on every contention,' the 'analysis' offered here is simply inadequate to afford the meaningful review that both" Oliva-Ramos and the Government deserve. *Zubeda v. Ashcroft*, 333 F.3d 463, 477 (3d Cir. 2003) (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)).

The Supreme Court has made clear that "[c]onsent must be given voluntarily." *Stabile*, 633 F.3d at 230 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). Thus, the Court requires a careful examination of the totality of the circumstances surrounding how that consent was obtained. *See United States v. Drayton*, 536 U.S. 194, 206-07 (2002). The appropriate inquiry into the voluntariness of a purported

consent would include, without limitation: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). We have also "identified as relevant 'the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.'" *Id.* In addition, the number of officers and displays of force are important factors. *See United States v. Kim*, 27 F.3d 947, 954 (3d Cir. 1994). This kind of particularized scrutiny was not applied to the evidence here because it was assumed that the Fourth Amendment remedy of suppression did not apply. Rather, the Form I-213 that was relied on to establish a consensual entry indicated that "[c]onsent to enter the premises was provided by Clara Oliva." That appears to have largely been the beginning and the end of the inquiry. As noted above, however, Officer Belluardo did not recall the specifics of the entry; she merely testified based upon what she said was normal procedure.

The BIA, therefore, erred in finding valid consent without analyzing the totality of the circumstances under the Fourth Amendment. Again, we take no position on what the outcome of that inquiry should be here. We only hold that the inquiry that appears on this record is not sufficient given the nature of Oliva-Ramos's claims.

### 2. 8 C.F.R. §§ 287.8(b)(1) (seizure)

The BIA correctly noted that 8 U.S.C. 1357(a)(1) permits an ICE agent, without a warrant, to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). We have made clear, however, that the "authority under Section 1357(a)(1) to interrogate a person believed to be an alien is limited by the restrictions of the fourth amendment." *Babula v. Immigration & Naturalization Service*, 665 F.2d 293, 295 (3d Cir. 1981) (citation omitted). As we noted in *Babula*, "[s]ince the same standards govern the validity of a seizure under section 1357(a)(1) as under the fourth amendment, questioning that is permissible under the fourth amendment is also permissible under section 1357(a)(1)." *Id.*

8 C.F.R. § 287.8 was promulgated pursuant to 8 U.S.C. § 1357(a)(1). This regulation incorporates the test that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Specifically, the regulation states: "An immigration officer, like any other person, has the right to ask questions of anyone *as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.*" 8 C.F.R. § 287.8(b)(1) (emphasis added).

In order to conduct a proper analysis under the Fourth Amendment, the BIA should have considered among the non-exclusive list of relevant factors, the circumstances that the Supreme Court described in *Mendenhall*. The *Mendenhall* Court explained that "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Although we do not decide whether those factors in fact existed, we discuss by way of example some of the considerations that could have influenced the *Mendenhall* analysis. Here, armed ICE officers entered Oliva-Ramos's room shining flashlights that woke him up at 4:30 in the morning. After he got up, he was told to go to the living room where officers blocked several exits and detained his family members. The record also indicates at least six armed uniformed ICE officers were present and that certain family members were told to sit down when they tried to stand.

In concluding that Oliva-Ramos was not improperly seized, the BIA relied exclusively on Oliva-Ramos's testimony during the suppression hearing that he had no intention of leaving the premises because he "didn't commit any crime." Yet the question of intent to leave is less relevant under the Fourth Amendment than whether he felt free to leave. *See Brendlin v. California*, 551 U.S. 249, 255 (2007)

("[T]he Court adopted Justice Stewart's touchstone [*Mendenhall* test], but added that when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'") (internal citations omitted).

*Mendenhall* makes clear that "circumstances that might indicate a seizure" may exist "even where the person did not attempt to leave . . . ." *Mendenhall*, 446 U.S. at 554. Here, while Oliva-Ramos may not have intended or attempted to leave his apartment at 4:30 a.m., the BIA must also inquire into whether he felt free to leave. (Question: "What would have happened if you'd asked the officers to leave?;" Response "I couldn't tell the officers to leave because it's the law and I didn't have anything to tell them."). The BIA, therefore, erred in rejecting Oliva-Ramos's claim of a regulatory violation without an adequate inquiry into whether Oliva-Ramos was seized before proceeding to find reasonable suspicion to detain him.

We caution, however, that nothing in this opinion is intended to undermine the ability of immigration officers to ask questions of a person to obtain his or her immigration status so long as the inquiry is consistent with the limitations imposed by the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). *Bostick* makes clear that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search . . . as long as the police do not convey a message that compliance with their requests is required." *Id.* (internal citations omitted). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Id.* at 434 (internal citation omitted). But the encounter "loses its consensual nature" and a seizure has occurred "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Id.*

42

Our discussion of these principles is not intended to resolve the merits of Oliva-Ramos's Fourth Amendment claims. Rather, we simply explain that the inquiry undertaken by the BIA was wrongly guided by its assumption that suppression is not permitted in removal proceedings. *Cf. Babula*, 665 F.2d at 296 (finding reasonable suspicion in the context of an automobile stop).

### 3. 8 C.F.R. § 287.8(c)(2)(i) (warrantless arrest)

We must also consider whether the BIA properly construed 8 C.F.R. § 287.8(c)(2)(i), which states that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8 (c)(2)(i). Section 287.8(c)(2)(i) emanates from INA § 287(a)(2), 8 U.S.C. § 1357(a)(2). We held in *Babula* that "under section 1357(a)(2) . . . 'arrest' means an arrest upon probable cause, and not simply a detention for purposes of interrogation." 665 F.2d at 298.

In *Tejeda-Mata v. Immigration & Naturalization Service*, 626 F.2d 721 (9th Cir. 1980), a case upon which the BIA relied in finding that Oliva-Ramos posed a flight risk, the Court of Appeals for the Ninth Circuit held that, in addition to the background circumstances of the interrogation, an uncoerced admission that a petitioner "came from Mexico . . . constitute[d] a clearly sufficient basis for his warrantless arrest." *Tejeda-Mata*, 626 F.2d at 725. There, Tejeda-Mata drove through a parking lot in Washington when an officer "recognized an alien whom he had previously arrested and who had been granted voluntary departure." *Id.* at 723. After the officer parked his car to block Tejeda-Mata, he jumped out of the car and asked the officer what was happening. The officer asked where he was from and Tejeda-Mata responded that he came from Mexico.

Here, it should be clear from what we have thus far explained that we cannot conclude that any statements related to Oliva-Ramos being a flight risk were uncoerced, without an examination by the BIA or the IJ in the first instance into whether Oliva-Ramos was improperly seized during the home

43

raid and subsequent arrest. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (stating that if evidence is obtained as a result of an unlawful seizure, it is to be excluded as the "'fruits' of the [officer's] unlawful action."). The BIA relied solely on a statement contained in the Form I-213 that Oliva-Ramos posed a flight risk, and thus § 287.8(c)(2)(i) permitted a warrantless arrest. Whether Oliva-Ramos's warrantless arrest was valid depends upon whether he was illegally seized. Thus, we will vacate the BIA's ruling as to regulatory violation 8 C.F.R. § 287.8(c)(2)(i) and remand for further consideration in light of the potential illegal seizure of Oliva-Ramos.

### 4. 8 C.F.R. § 287.8(c)(2)(vii) (coerced statements)

8 C.F.R. § 287.8(c)(2)(vii) prohibits "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement . . . ." 8 C.F.R. § 287.8(c)(2)(vii). The BIA combined its analysis of this regulatory provision with the discussion of an improper seizure under 8 C.F.R. § 287.8(b)(1). Based on our discussion of the circumstances surrounding the potential improper seizure and coercion, we will remand for further consideration of 8 C.F.R. § 287.8(c)(2)(vii) and any potential violation of the Due Process Clause of the Fifth Amendment.

### 5. 8 C.F.R. § 292.5(b) (right to counsel)

In addition to the regulatory violations discussed above, Oliva-Ramos also claims that ICE agents violated 8 C.F.R. § 292.5(b). That regulation provides:

> Whenever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney or representative who shall be permitted to examine or cross-examine such person and witnesses, to introduce evidence, to make objections which shall be stated succinctly and entered on the record, and to submit briefs. Provided, that nothing in this paragraph shall be construed to provide any applicant for admission in either primary or secondary

> inspection the right to representation, unless the applicant for admission has become the focus of a criminal investigation and has been taken into custody.

8 C.F.R. § 292.5. The BIA rejected Oliva-Ramos's challenge to this provision, concluding that the Government is only required to inform an alien of his right to legal representation after he is placed into formal proceedings. *See Samayoa-Martinez v. Holder*, 558 F.3d 897, 901-02 (9th Cir. 2009)). We agree with the Board's interpretation of § 292.5. Formal removal proceedings begin only after the Government has filed a Notice to Appear in immigration court. *See* 8 C.F.R. § 1239.1(a) ("Every removal proceeding conducted under section 240 of the Act (8 U.S.C. § 1229a) to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court."). Here, although the Government issued its Notice to Appear for Oliva-Ramos on March 26, 2007, the notice was not filed with the Immigration Court—thus initiating formal proceedings—until March 29, 2007. That Notice to Appear also provided a statement informing Oliva-Ramos of his right to representation. Thus we will affirm the BIA as to its ruling on § 292.5 because we conclude that Oliva-Ramos was notified of his right to counsel before he was placed in formal proceedings.[28]

**Conclusion**

For the reasons discussed above, we will vacate in part and will affirm in part, the BIA's August 31, 2010 order, and we will remand to the BIA with instructions that it grant the motion to reopen the proceedings and that it conduct further

---

[28] We need not consider additional regulatory violations reached by the BIA as Oliva-Ramos has not appealed the BIA's decision as to 8 C.F.R. § 287.3 (failure to provide "timely" advice of rights), 8 C.F.R. § 287.3(a) (examination by same officer who arrested respondent), and 8 C.F.R. § 287.8(d)(1) (conditions of prolonged detention in a van).

proceedings (which may include a remand to the IJ) consistent with this opinion.[29]

---

[29] The panel notes that Ms. Nikki Reisch argued on behalf of Petitioner as an eligible law student pursuant to Local Appellate Rule 46.3.  The Court commends her exceptional oral advocacy and expresses its gratitude to her and to the New York University School of Law and the Washington Square Legal Services, Inc. for the *pro bono* representation provided for the Petitioner in this matter.